Viola KEEN, Plaintiff and Appellant,

v.

William G. LARSON, as administrator of the estate of Nick Sekulich, deceased, and State of North Dakota, Defendants and Respondents.

No. 8176.

Supreme Court of North Dakota.

Dec. 30, 1964.

Duffy & Haugland, Devils Lake, for appellant.

Paul L. Agneberg, Cando, for respondent William G. Larson.

Helgi Johanneson, Atty. Gen., and Vance K. Hill, Asst. Atty. Gen., Bismarck, for respondent State of North Dakota.

TEIGEN, Judge.

The plaintiff has appealed from a judgment of dismissal in an action for specific performance of an agreement to leave property to her at the death of her stepfather, Nick Sekulich. The action was brought against the administrator of his estate and the State of North Dakota. Nick Sekulich died intestate leaving no heirs at law and, therefore, the residue of his estate is subject to escheat to the State of North Dakota. The action is resisted by the State. Trial de novo has been demanded.

The plaintiff was born in Missouri in 1906. She moved with her parents to Rock Lake, North Dakota, in 1912. Her father died in 1913. She was then 7 years of age.

The plaintiff's mother married Nick Sekulich on October 6, 1915. He moved into the home in which the plaintiff and her mother resided. No children were born the issue of this marriage.

The evidence establishes that Nick Sekulich had no property. The plaintiff's mother financed the purchase of a pool hall business which they operated for about one year. He then worked at odd jobs for approximately two years. Thereafter the mother and stepfather rented a farm and commenced farming. The plaintiff's mother purchased the necessary farm tools, equipment, and livestock to operate the farm. The plaintiff remained in the home until she married in December of 1920.

In 1943 the plaintiff's mother and her stepfather, Nick Sekulich, purchased two quarter sections of farm land on a contract for deed for the sum of $4,000. The sum of $500 was paid down on the contract and the balance was payable in nine annual installments of $300 each, and a tenth annual installment of $800, together with interest at the rate of 5% per annum. The contract names the plaintiff's mother and her husband, Nick Sekulich, as joint tenant purchasers. The land is the principal asset in the estate. It was appraised at $13,000.

The plaintiff's mother died in 1949. Her stepfather continued to operate the farm until February of 1951 when he was committed to the State Hospital for the mentally ill. Except for brief visits, he remained in the hospital until his death. A guardian was appointed for his estate. He died intestate on November 18, 1960, and left no surviving heirs or next of kin.

The plaintiff pleads and contends that following the death of her mother in October of 1949, her stepfather, Nick Sekulich, promised and agreed with her that, if she made no claim to her mother's interest in the property and permitted him to use and occupy it as long as he lived, he would leave it all to her upon his death. Therefore, she made no demand upon him during his life-

time for a share of her mother's estate. There was no probate of the plaintiff's mother's estate. It appears the land contract was paid up and we assume the deed was secured in the name of Nick Sekulich, whose estate is now in the process of probate. This action is brought against the administrator for specific performance of the agreement which the plaintiff contends was entered into between herself and the said Nick Sekulich that she should receive all of his property upon his death.

The defendants answered separately denying the agreement and affirmatively alleging that the oral contract falls within the statute of frauds.

The case was tried to the court without a jury. The trial court found for the defendants and dismissed the action. The trial court in its memorandum opinion stated:

> "It is not seriously questioned that some form of contract was entered into between these parties."

However, the trial court determined that the proof was not sufficient to establish the rendition of a valuable or adequate consideration or that such proof established that the oral contract relied upon was fair and just and, therefore, the plaintiff had failed to bring the alleged contract within the prerequisites for equitable relief.

■ We agree with the trial court that the evidence does establish an agreement. The plaintiff testified:

"Q. And while she was at the hospital or shortly before her death did she have any conversation with you with reference to the property or her estate?

"A. Yes.

"Q. Will you tell us what she said at that time?

"A. Well, she said at that time that she wanted us to divide it and divide it half and half.

"Q. Wanted 'us'; you mean. * * *

"A. Nick and I.

"Q. Did you consequently and after your mother's death have a conversation with Nick with reference to that? Now remember, I don't want you to tell me what the conversation was. Just answer 'yes' or 'no.'

"A. Yes."

The plaintiff's son testified:

"Q. Do you remember one particular occasion when he was there I believe for supper and had some conversation with your mother with reference to the property that he and Mrs. Sekulich had?

"A. That was after Grandma's death?

"Q. Yes.

"A. Yes, they had a little conversation.

"Q. Will you tell us what that conversation was?

"A. Well, they more or less mutually agreed that he was going to stay on the place as long as he lived and that Viola Keen was to have the property after he passed away, and I guess he was kind of under the impression that Mother was going to move him off or something because he seemed to be worried, and the way I understood, he stated he would like to live there until he died, and his belongings were to go to Mrs. Keen after he was gone."

On cross-examination he testified:

"Q. What was that conversation, as you recall?

"A. They were sitting discussing things in general and he was, seemed to be, rather worried if he was going to be able to stay

on, because I imagine he had felt the property belonged to Mother, and he was worried she was going to put him off, and they agreed and there was nothing national about it, they just said he would stay out there and farm until he passed away and then Mother was supposed to take the property."

On recross-examination, he testified:

"Q. Getting back to the conversation your mother had with her stepfather, Mr. Sekulich, this was a kind of a casual conversation, or was it a deliberate agreement?

"A. I think it was a deliberate agreement. They were trying to come to some sort of agreement, that is what I took it for granted. Everything was serious. They weren't joking about it."

The plaintiff's husband testified on direct examination as follows:

"Q. Do you recall any conversation when he was at your place when there was conversation between Nick and Viola with reference to the property that the Sekulichs had?

"A. Yes.

"Q. Do you know about how long after Mrs. Sekulich died this conversation took place?

"A. Oh, I would say it was approximately two months afterwards.

"Q. And this happened at your home in Cando?

"A. Yes.

"Q. Will you tell us, if you remember it, the conversation that took place at that time between Nick and Viola?

"A. Well, as I remember it, she asked him something about her share of

it, or something,—I don't know just how * * * and he told her he wanted to stay there as long as he lived and then she could have it all. That is about all I remember about it.

"Q. And did your wife say anything in regard to whether that would be satisfactory or otherwise?

"A. Well, it seemed to be satisfactory.

"Q. Anyway, she made no claim on the estate, and he did continue to keep the property?

"A. Right."

Mr. Al Fosaaen, an attorney, testified that Nick Sekulich called at his office in 1950 at which time he acted as his legal advisor and, relative to this matter, testified as follows:

"Q. Did he at one time ask you to prepare an inventory of his property and turn that inventory over to Mrs. Keen so that she would know what property she was interested in?

"A. Yes. With the Court's permission, I would like to explain the situation.

"THE COURT: Go ahead.

"A. At one time Mr. Sekulich came in, —unfortunately I don't have a date on it,—I would say it was in 1950 or thereabouts. Nick was a very unusual person, almost a legend in this county. He was unlearned in English and had a great distrust of lawyers. He preferred to do things his own way. He came to my office and we discussed the status of his property. At that time I think Nick had been ill or in the hospital in Devils Lake. I have a note that Max Hauschulz of Rock Lake had been in the office, too. Nick referred to Mrs. Keen as his daughter, and I did not draw up a

Will because of the laws of testacy. He referred to her as his daughter and I assumed she was. However, we did prepare an inventory of all the property Mr. Sekulich owned. I have that in my hand now. My instruction at that time was to turn this over to Mrs. Keen in the event of his death.

"Q. Can you tell us anything else with reference to the relationship of these parties or what Nick was planning?

"A. All I know, he referred to her as his daughter, and that is the reason I didn't draw up a Will. That is one of the first years I practiced, and when he referred to her as his daughter. * * * As I said, he didn't like lawyers, said he didn't want lawyers to get the major share of his estate, and no Will was made."

On cross-examination, he testified:

"Q. When did you learn plaintiff was not actually his daughter?

"A. Sometime after, oh, years later. Sometime after Nick was in Jamestown, maybe. It was several years afterwards that I learned that."

On recross-examination, he testified in part as follows:

"Q. It is your testimony you advised Mr. Sekulich he didn't need to make a Will because Mrs. Keen was his daughter and would get his property anyway?

"A. I don't think I ever advised anyone not to draw a Will, but I explained the intestacy laws and he decided he didn't want to. He didn't want anything to do with attorneys.

"Q. He didn't want anything to do with attorneys and you advised him that under the laws of inheritance his daughter would receive the property without a Will?

"A. Yes.

"Q. If Mr. Sekulich was ever aware of a Will, would he know what a Will was if he heard the term mentioned?

"A. I think he did.

"Q. And you think Mr. Sekulich was under the impression that no Will was necessary because Mrs. Keen would get the property anyway?

"A. I am sure he wouldn't have left my office without a Will if I had known Mrs. Keen was a stepdaughter.

"Q. You would have insisted on a Will?

"A. I think any of us would have done that."

We find the evidence ample to sustain the trial court's finding that there was an agreement entered into following the plaintiff's mother's death between herself and the deceased, Nick Sekulich, to the effect that, if the plaintiff would forbear a demand upon him for her mother's interest in the property and permit him to possess it during his lifetime, the plaintiff would receive the entire estate upon his death.

The plaintiff testified that her mother's money was used to acquire the property. In this she is corroborated by a neighbor who had known the plaintiff's mother since 1912 and her stepfather since before 1910. The neighbor testified to a conversation with the deceased, Nick Sekulich, at the time when he and his wife purchased the farm, as follows:

"Q. Did you have occasion to talk with Nick as to how he was able to buy the farm?

"A. Yes, I asked him how he could buy a farm when he didn't have any money, when he didn't have any more than I did, and he said his wife had money.

"MR. HILL: What was that answer again, please?

"A. I asked him how he could buy a farm when he didn't have any more money than I did, and he said his wife had money.

"MR. HILL: The land you refer to are the two quarters?

"A. Yes, the two quarters by Snyder Lake."

On cross-examination, she testified:

"Q. Maggie, did you know if Mrs. Sekulich had money of her own?

"A. She did.

"Q. How did you know that?

"A. She was in business in Rock Lake, and I used to go there when I was a girl.

"Q. When was that?

"A. Well, from nineteen-twelve, I think it was,—I wouldn't say the date, Paul, but from 1912 on.

"Q. And did you know she had money at the time they bought this land?

"A. He told me she did.

"Q. That is all you knew about it?

"A. He could never have bought it otherwise. He had none."

The evidence establishes the deceased, Nick Sekulich, was fond of the plaintiff. On occasion he would introduce her by using such endearing words as: "This is my daughter, the best girl in the world."

The evidence also establishes the plaintiff helped her stepfather in various ways and that, subsequent to the death of the plaintiff's mother and until Nick Sekulich was committed to the State Hospital, the relationship between the two continued to be amicable. The plaintiff's stepfather often called at her home in Cando and had meals there.

The only probative value this evidence has is to cast light on the probabilities of the agreement. We find the evidence of friendly relationship, together with the other evidence alluded to herein, establishes the agreement was not contrary to reasonable probabilities.

The defendants also urge the agreement, if any, is void as it transcends the statute of frauds, because it was not in writing. Section 9–06–04(4), N.D.C.C.

■ This argument has no merit as there was performance sufficient to take the transaction out of the statute. The plaintiff had fully performed her part of the agreement. She did not press a claim for her interest in her mother's estate. Nick Sekulich accepted the benefits. He remained on the land, operated it, and received the earnings from it until he was committed to the mental hospital. Thereafter a guardian was appointed for his estate and the land was farmed under the jurisdiction of the probate court for the benefit of his estate until his death. We find this was sufficient performance of the oral agreement to remove it from the operation of the statute of frauds. O'Connor v. Immele, 77 N.D. 346, 43 N.W.2d 649; Hagen v. Schluchter (N.D.), 126 N.W.2d 899.

■ The defendants further argue there was a failure of consideration in that performance by the plaintiff could only be termed "failure to do anything." They argue that a failure to contest a part of almost nothing would not be sufficient consideration for the property. They also argue that the land at that time was purchased in joint tenancy; that the personal

property consisted of the furnishings of the dwelling and some old farm equipment which was listed in the inventory as scrap; and that if the plaintiff had instituted such action at the time she would not have been successful.

The contract was fully performed by the plaintiff and we believe there was adequate consideration for the agreement. The plaintiff's mother financed Nick Sekulich in getting started; he had nothing. The plaintiff's mother financed the pool hall business. She purchased the livestock, farm machinery, and tools when they started farming, and she also furnished the money for the downpayment on the purchase of the land. It appears Nick Sekulich rented the land in question before it was purchased in 1943. An exhibit indicates that in 1941 Mr. Sekulich was delinquent on some notes due his landlord and was threatened with termination of the rental agreement unless he made payment. The record does not establish whether or not he paid. The evidence that plaintiff's mother furnished these moneys is not rebutted and apparently the plaintiff's mother thought she had an interest in the property. While she was on her death bed, she requested that the property be divided equally between the daughter and her husband. It is also apparent from the evidence that Mr. Sekulich thought she had an interest. It appears he thought she would move him off the property and he made the agreement on the consideration that plaintiff would permit him to occupy it as long as he lived. The evidence negatives any intention by the mother to make a gift to her husband. The evidence also establishes that Mr. Sekulich attempted to carry out the agreement when he contacted Mr. Fosaaen, his attorney, and was told that upon his death his property would go to the plaintiff under the laws of intestacy and without a will.

The evidence tends to negate the proposition that taking the contract for deed as joint tenants with the right of survivorship and not as tenants in common established a contract that the survivor should take all.

We believe the evidence establishes that the plaintiff had a cause of action on the theory that an implied trust was created presumptively by operation of law (Section 59–01–05, N.D.C.C.) when the transfer of real property was made to Nick Sekulich and the consideration therefor was paid by his wife under Section 59–01–06(4), N.D.C.C., although such presumption might be rebutted by competent evidence. Redman v. Biewer, 78 N.D. 120, 48 N.W.2d 372. It was not rebutted.

There is no statutory presumption of gift where a wife furnishes the consideration for a transfer of real property taken in the names of the husband and wife as joint tenants in this State and the historic common law rule does not apply. Section 1–02–01, N.D.C.C. Our Constitution provides that the property of any woman in this State acquired before or after marriage shall be her separate property and she is not liable for the debts of her husband. Section 213, Constitution of North Dakota.

■ The evidence establishes that the agreement was based on a forbearance to bring suit for the enforcement of a claimed legal right. This constitutes consideration to support a promise to leave all of the property in question to the plaintiff upon his death. 57 Am.Jur., Wills, Sec. 172; Frieders v. Frieders' Estate, 180 Wis. 430, 193 N.W. 77, 31 A.L.R. 118; Murtha v. Donohoo, 149 Wis. 481, 134 N.W. 406, 136 N.W. 158, 41 L.R.A.,N.S., 246; Ashbauth v. Davis, 71 Idaho 150, 227 P.2d 954, 32 A.L.R. 2d 361.

"The waiver of a right or forbearance to exercise the same is a sufficient consideration for a contract, whether the right be legal or equitable, or exists against the promisor or a third person, provided it is not utterly groundless." 17 C.J.S. Contracts § 103.

■ Refraining from bringing a suit may be sufficient consideration. See 17 C.J.S. Contracts § 104(1).

■ Refraining from enforcing a claim which might reasonably be thought to be doubtful is a sufficient consideration. See 17 C.J.S. Contracts § 104(2).

. Nick Sekulich had no children. In fact, he had no heirs to succeed to his estate under the laws of succession. He was an immigrant who had no formal education in this country. Under the circumstances, as they existed in this case, we find there was sufficient consideration for the agreement, that it was not contrary to reasonable probabilities, and that it was not inequitable to third persons.

For these reasons, we believe, the plaintiff had a bona fide claim against Nick Sekulich for at least a substantial interest in the property. We need not determine whether she would have prevailed had an action been commenced and tried.

■ The evidence is sufficient to establish that both persons had reasonable grounds for believing the plaintiff had a bona fide claim and that both parties acted in good faith. A compromise of a bona fide controversy constitutes a good consideration for a promise. McGlynn v. Scott, 4 N.D. 18, 58 N.W. 460; Fryar v. Cetnor, 6 N.D. 518, 72 N.W. 909; Silander v. Gronna, 15 N.D. 552, 108 N.W. 544.

■ A legal detriment may be sustained by a promisee by the surrender of a legal right, whether such right has substantial value or not. Divide County v. Citizens State Bank, 52 N.D. 29, 201 N.W. 693.

Judgment is reversed.

MORRIS, C. J., BURKE and ERICSTAD, JJ., and EUGENE BURDICK, D. J., concur.

STRUTZ, J., did not participate; EUGENE BURDICK, D. J., sitting in his stead.