450 P.2d 614

**Julia ARAGON, Plaintiff-Appellant,**

v.

**Thomas E. BOYD and Carmen Edwards, Executors of the Estate of Slaughter T. Murray, Deceased, Defendants-Appellees.**

No. 8681.

Supreme Court of New Mexico.

Feb. 17, 1969.

Ramon Lopez, Lorenzo A. Chavez, Melvin L. Robins, Albuquerque, for plaintiff-appellant.

Quinn & Bonem, Clovis, for defendants-appellees.

## OPINION

MOISE, Justice.

Plaintiff-appellant brought this action against defendants-appellees, executors of the estate of Slaughter T. Murray, deceased, seeking damages for the alleged breach by decedent of a contract to devise certain property to plaintiff.

The facts established at the trial are generally not in dispute. It appears that plaintiff, when a young girl 8 or 9 years of age, was taken into the home of Mr. and

Mrs. Edmund Evans. Also living in the same home were decedent and his wife, Lola, who was the Evans' daughter. Decedent and his wife had no children. Plaintiff lived in the home as a member of the family for some seven years, until 1932, when she married and moved away. However, a very close relationship continued between plaintiff and the Evanses and the Murrays. Mr. Evans died in 1953, Mrs. Evans in 1958, and Mrs. Murray in May, 1963. According to plaintiff, Mr. Evans, before his death, promised to provide money so she could educate her children. Later, Mrs. Evans had said the same thing, and Mrs. Murray, some two weeks before she died, had told plaintiff that Mr. Evans had left $35,000.00 for plaintiff and the house (residence in Clovis) was also going to be hers. Plaintiff further testified that a few days after Mrs. Murray was buried, Mr. Murray called her to come to Clovis at which time he told her that Mr. Evans had left her $35,000.00 and inquired if she would rather have the "house or the money," to which she replied that she would rather have the house as he might need the money and that he could continue to live in the house. He then said he would make a will leaving her the house. Following this, on May 21, 1963, decedent made a will which provided for the sale of the house and payment of the proceeds to plaintiff.

However, on August 27, 1963, decedent executed a new will which provided the proceeds from the sale of the house should go to two of his brothers and a sister. In June, 1965, decedent sold the house to a sister for $30,000.00 and then made a new will, dated June 28, 1965, revoking all previous wills and providing for the devolution of his property, but leaving nothing to plaintiff.

The testimony of plaintiff concerning the conversation at which decedent offered plaintiff $35,000.00 cash left to her by Mr. Evans, or the house, was corroborated by plaintiff's husband and son. In addition, the wife of a cousin of Mrs. Murray testified that decedent had stated that plaintiff

would be provided for. Also, there is testimony that plaintiff stayed with decedent in Clovis during most of the summer of 1963 upon his request that she do so and get the house in shape so it would be easy to keep clean; that she did so, cleaning, painting and repairing the house with the understanding that it was to be hers upon decedent's death. As a part of this activity plaintiff ordered curtains from Spiegel's, a mail order house, and placed them in decedent's home. Although decedent paid for all other expenses in connection with the cleaning and repairing of the house, he refused to pay for the curtains as stated in letter hereinafter quoted, and plaintiff paid for them with her own funds.

In addition, letters from decedent to plaintiff were introduced. In one of these, which is undated, but was evidently sent about October 17, 1963, is found the following:

"Julia you said Spiegel was yapping for the money of the curtains you put here in the house when I show you & Abel that Will I made you for the house. I told you it was good as gold if help me get the house in shape so it be easy to keep clean. That was done & settled. You pay for the curtains."

Under date of November 14, 1963, plaintiff wrote decedent a letter, in which the following is stated:

"I sent that envelope with the *will* and the *Oil Contract*. Abel is still wondering, why you put his social security number on that *Oil Contract* that you made. Really Slaughter, we don't want to accept that Contract of those Oil Royalties, because that comes from your folks. We don't think that is right, As for the *Will*, that was Uncle Dume's [Mr. Evans] property, and by right it will belong to me after you are gone. So we rather for you not to register that contract, like you said you were going to. As for the house, you said in your letter that a Contract is better than a WILL and if you sell it now for sixty thousand dollars and make sure they will not tear

**16**

it down until after you die, then you can do that if you think that it is better for me. The main thing, is that you stay in that house as long as you live and if you get to the point that you can't take care of yourself, you come and live with us and they can go ahead and tear it then."

to which decedent replied, as follows:

"I received the Will & oil contract. If you decide to sell the house send me a short note that you want to sell the house. I will need that. That oil Co. is still wanting to buy the house. They will give you sixty thousand dollars & int. ten thousand a year. That's a good deal.

"Julia my folks are putting a lot of pressure don't know what to do. I don't want them to know Mr. Evans left you thirty five thousand dollars too. & about that agreement we made that you keep the house with every thing & I keep the money, for your own good keep your mouth shut."

We take particular note of the fact the will made in May, 1963, a copy of which had been given to plaintiff, had been revoked by a new will made in August, 1963, and still in October and November, 1963, the correspondence indicates that plaintiff had not been advised. As a matter of fact, plaintiff testified she did not know of any new will. She learned of the sale of the property in 1965, but was not concerned about it. Also, during the period, decedent had given a check for $1,000.00 as a gift to plaintiff and her husband. She also testified that decedent's feelings toward her had altered because of her disapproval of a plan of his to move his wife's body to a lot closer to where her mother was buried, and to remove her father's remains from that location to where Mrs. Murray had been buried.

The only other pertinent evidence in the record has to do with plaintiff's request, some time before January, 1966, to borrow $10,000.00 from decedent, and her offer to give as security the property owned by her and her husband in Tucumcari.

Defendants raise the question of why she should have made such an offer if she was honestly of the opinion that the Clovis home was hers or was to become hers.

The trial court found that shortly after the death of Lola, his wife, decedent asked plaintiff to come to Clovis and there advised her that she could have her choice between $35,000.00 cash and the house located at 1000 Main Street in Clovis. Upon plaintiff indicating a preference for the house, decedent stated he would make a will leaving it to her. Thereafter, decedent made a will in which he provided for sale of the house, with proceeds to go to plaintiff, and in letters in October and November, 1963, acknowledged that he had made a will devising "the house" to plaintiff, and that this had been her choice, rather than money. However, subsequently, on or about August 27, 1963, another will was made wherein no provision was made for plaintiff, and proceeds from sale of the house were directed to go to others. In June, 1965, the will later admitted to probate was executed. It made no provision for plaintiff.

Notwithstanding the foregoing findings, the trial court also found that plaintiff did not have a reasonable belief that she had an enforceable claim against the estate of either Mr. or Mrs. Evans or Mrs. Murray, and did not forbear to exercise any such right because of decedent's promise to devise the house. The court then concluded that plaintiff had not proved the terms of the contract she claimed had been entered into with decedent for the devise of the house at 1000 Main Street, Clovis, by clear, convincing and satisfactory evidence; that plaintiff failed to establish any consideration passing from her to support a contract; that the contract asserted was for the conveyance of real estate and no written memoranda sufficient to meet the requirements of the statute of frauds had been presented; that decedent's promise to devise the property by will was not a present gift, and that the May, 1963, will was duly revoked by the later will admitted to probate without objection.

We first consider whether the court correctly ruled that the contract asserted by plaintiff was unenforceable because of the absence of a sufficient memorandum signed by the party to be charged, as required by the statute of frauds. The applicable rules were recently discussed by us in Jennings v. Ruidoso Racing Association, 79 N.M. 144, 441 P.2d 42, 44 (1968), where we said:

"* * * The statute is not pressed 'to the extreme of a literal and rigid logic.' Marks v. Cowdin, 226 N.Y. 138, 123 N.E. 139. The statute of frauds is intended to protect against a fraud, but it is not intended to be taken as an escape for those seeking to avoid their obligations. Keirsey v. Hirsch, 58 N.M. 18, 26, 265 P.2d 346, 43 A.L.R.2d 929. It must be remembered that the memorandum, sufficient to satisfy the statute of frauds, need not in itself amount to a contract. The contract in this instance is an oral agreement. The statute of frauds only requires that there be written evidence to prove that the particular contract was made. Pitek v. McGuire, supra. * * *"

In Pitek v. McGuire, 51 N.M. 364, 184 P.2d 647, 1 A.L.R.2d 830 (1947), is found the following additional detailing of the requirements for complying with the statute of frauds:

"To satisfy the statute of frauds the contract itself must be in writing; or if verbal, then there must have been some writing subsequently made however informal, stating each of its essential elements, signed by the person to be charged, or by his authorized agent acting for him.

"The essentials of such contracts have been stated as follows:

"'A memorandum, in order to make enforceable a contract within the statute, may be any document or writing, formal or informal, signed by the party to be charged or by his agent actually or apparently authorized thereunto, which states with reasonable certainty, (a) Each party to the contract either by his own name, or by such a description as will serve to identify him, or by the name or description of his agent, and (b) the land, goods, or other subject-matter to which the contract relates, and (c) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made.' Restatement of Law of Contracts, Sec. 207.

"'Generally speaking, a memorandum in writing meets the requirements of the statute of frauds that certain contracts shall be evidenced by writing if it contains the names of the parties, the terms and conditions of the contract, and a description of the property sufficient to render it capable of identification.' 49 A.J. 'Statute of Frauds' Sec. 321. * * *

"There is a difference between a contract in writing and a memorandum of a parol contract as contemplated by the statute of frauds. The former may be made up of letters and telegrams or any other character of writing or writings, which together will constitute a contract, or it may be a formal contract. But if the contract made is oral, it is written evidence to prove that the particular contract was made that must be produced. The writings need not in themselves amount to a contract or be addressed to the other party. It is sufficient as evidence if the person to be bound signs any statement or document in which he admits that parties made the oral contract, sufficiently stating therein its essential terms (2 Williston on Contracts [Rev.Ed.] Secs. 567, 579[a]); no matter what may be his purpose in making the writing, or to whom it is addressed. 2 Williston on Contracts (Rev.Ed.) Sec. 579, 568; 1 Restatement of Law of Contracts, Sec. 209."

No argument is here advanced that the property was not sufficiently described. See Pitek v. McGuire, supra; Robinson v. Black, 73 N.M. 116, 385 P.2d 971 (1963). Furthermore, we do not understand how it can be asserted, in the light of the language

quoted above, that there was no understanding between the parties that the house had been willed to plaintiff by decedent in compliance with some instruction concerning a gift of $35,000.00 intended for her by Mr. Evans, and by descent having come into the hands of decedent, or in fulfillment of an agreement to leave the house to plaintiff in exchange for her having cleaned it and made it easier to keep, during her stay with decedent in the summer of 1963. What else could be the meaning of, "that was done and settled you pay for the curtains." There could be no possible theory upon which plaintiff should pay for curtains put into the Clovis house, except that the house was hers or was to become hers.

 While we are clearly of the opinion that sufficient memoranda were introduced in evidence to establish the contract under the cases cited above, we would also note that when plaintiff performed her part of the contract by helping to "get the house in shape so it be easy to keep clean," which "was done and settled" and abstained from claiming the $35,000.00 there had been full performance by plaintiff of her agreement and if otherwise defective this would have been sufficient to satisfy the requirements of the statute. See Wooley v. Shell Petroleum Corp., 39 N.M. 256, 45 P.2d 927 (1935). The services, because of the relationship of the parties, were of a nature not readily compensable in money, and to deny them efficacy would operate to defraud plaintiff. Compare, In re McGee's Estate, 46 N.M. 256, 127 P.2d 239 (1942).

The situation is almost identical with that which was present in Keen v. Larson, 132 N.W.2d 350 (N.D.1964), except that in the instant case the proof is much stronger. In the North Dakota case plaintiff sought specific performance of a parol contract with her stepfather wherein she claimed he agreed she should receive a certain piece of property on his death if he could keep it during his life. The property had been purchased by plaintiff's mother with her own funds, and title had been taken by her as a joint tenant with her husband. Upon the mother's death title vested in the husband (plaintiff's stepfather) as the survivor. Plaintiff testified that her mother wanted her property divided equally between plaintiff and her stepfather. There was proof that, after her mother's death, plaintiff had a conversation with her stepfather in which it was agreed the stepfather should live on the property until his death, after which the plaintiff would get it. It appeared that the stepfather was concerned that something might be done to move him from the property, and although nothing more was said he lived there until he died without leaving a will. The trial court found a contract but held it unenforceable as in violation of the statute of frauds, and for failure of proof of consideration. The court reversed, holding that forbearance to bring suit constituted sufficient performance to take the case out of the statute of frauds. We quote therefrom:

"The defendants also urge the agreement, if any, is void as it transcends the statute of frauds, because it was not in writing. Section 9-06-04(4), N.D.C.C.

"This argument has no merit as there was performance sufficient to take the transaction out of the statute. The plaintiff had fully performed her part of the agreement. She did not press a claim for her interest in her mother's estate. Nick Sekulich accepted the benefits. He remained on the land, operated it, and received the earnings from it until he was committed to the mental hospital. Thereafter a guardian was appointed for his estate and the land was farmed under the jurisdiction of the probate court for the benefit of his estate until his death. We find this was sufficient performance of the oral agreement to remove it from the operation of the statute of frauds. O'Connor v. Immele, 77 N.D. 346, 43 N.W.2d 649; Hagen v. Schluchter (N. D.), 126 N.W.2d 899."

Defendants direct our attention to Paulson v. Paulson, 241 Or. 88, 404 P.2d 199 (1965), in support of their position that the proof here was insufficient to establish a contract. We do not consider that case per-

suasive. Necessarily, it turned on its own peculiar facts. More pertinent to our inquiry, in our view, is Clark v. Portland Trust Bank, 221 Or. 339, 351 P.2d 51 (1960), where the factual situation was in many ways comparable to ours, and a finding of an enforceable contract to make a will was upheld in the face of assertions of violation of the statute of frauds and an absence of consideration.

We see nothing in either In re Cox' Estate, 57 N.M. 543, 260 P.2d 909 (1953), or in Tellez v. Tellez, 51 N.M. 416, 186 P.2d 390 (1947), relied on by defendants, which dictates or requires a different conclusion. Indeed, in our view, In re Cox' Estate, supra, lends support to plaintiff. We quote therefrom:

"* * * We must assume also that the legislature well knew the rule that one who has performed all the conditions of a contract entitling him to receive a devise by will in compensation for his performance, may enlist the powers of equity in his behalf and have considered as made in his favor the will which ought to have been made, even in cases where no writing or memorandum of the agreement was made. Did the legislature intend to nullify such contracts which for hundreds of years have been deemed valid, yes, have even the peculiar subjects of equitable favor, and all claims for reasonable compensation based thereon, unless the recipient of the benefits left his written and signed memorandum of the agreement? If so, the legislative intent so to do could have been made perfectly clear by the use of a few simple words. The legislature refrained from using those few words. Instead it used other words which cannot be said to refer to an agreement to make a will, except by a strained and unusual construction. It seems to us that this was intentional; that it was not the purpose of the legislature to change the age-old rule relating to the right to contract to make wills to certain intents, or to the right to recover for services rendered under contracts if they cannot be caused to be specifically performed. Of course, in all such cases, if there be no signed memorandum, the proofs must be clear and strong, but that has always been the rule in such matters."

It follows that the court was in error in holding that the contract was unenforceable because not complying with the statute of frauds.

■■ Similarly, we are of the opinion that the court erred when it concluded that no sufficient showing had been made to support a contract. That during the summer of 1963 plaintiff gave of her time and effort to clean and repair the house so as to make it easier to keep, was found by the court. However, it was further found that this was not done in exchange for a promise to transfer the house at the time of decedent's death. In our view, this latter finding in no sense accords with the proof. What possible reason can be advanced for decedent's insistence that plaintiff pay for curtains put in the house if it was not because of an understanding that it was to be hers? However, even more compelling is decedent's statement in his letter to plaintiff that the will that he had shown her was "good as gold if [you] help[ed] me get the house in shape so it [would] be easy to keep clean. *That was done & settled.* You pay for the curtains." (Emphasis supplied) This language is susceptible of no interpretation other than the one claimed by plaintiff to the effect the house was to be left to her by will if she did the work decedent wanted done. There is nothing in the record to the contrary, or that would in any sense cast any reasonable doubts on this proof, and accordingly the proof cannot arbitrarily be disregarded by the trial court under the rule announced in Medler v. Henry, 44 N.M. 275, 101 P.2d 398 (1940), and more recently restated in Frederick v. Younger Van Lines, 74 N.M. 320, 393 P.2d 438 (1964). In view of the agreement of the parties, plaintiff's efforts, noted above, to borrow $10,000.00 from decedent, is not sufficient to justify a different result.

Although plaintiff's testimony, unsupported by other proof, might fall short of that certainty and precision required to establish a contract such as is asserted, certainly the letter—written after the will described as "good as gold" had been revoked—is unassailable to support plaintiff's position that she had agreed to do the work, and had done it with the understanding the house was to be hers. Decedent said it was "done and settled." This proof is in writing and there is nothing to the contrary in the record. We are in as good position to evaluate it as was the trial court. See Price v. Johnson, 78 N.M. 123, 428 P.2d 978 (1967); Garry v. Atchison, T. & S. F. Ry. Co., 71 N.M. 370, 378 P.2d 609 (1963).

That sufficient consideration for the agreement was thereby established is not only clear and certain, but any other result is totally lacking in support. In addition, plaintiff points to her knowledge that Mr. Evans had left $35,000.00, which she understood was to be hers. It has been held, on similar facts, that a valid claim on the basis of a trust is thereby established. See Keller v. Keller, 351 Pa. 461, 41 A.2d 547 (1945); In re Free's Estate, 327 Pa. 362, 194 A. 492 (1937). Likewise, an agreement to forbear assertion of a claim honestly believed to be valid would constitute consideration. This is true even if in fact plaintiff had no enforceable claim, provided her position was taken in good faith. See Hughes v. Betenbough, 70 N.M. 283, 373 P.2d 318 (1962). Neither Lowery v. Robinson, 238 Cal.App.2d 36, 47 Cal.Rptr. 495 (1965), nor Leonard v. Gallagher, 235 Cal.App.2d 362, 45 Cal.Rptr. 211 (1965), relied on by defendants, requires a different result, and Enslow v. von Guenthner, 193 Cal.App.2d 318, 14 Cal.Rptr. 231 (1961), also relied on by defendants, in our opinion, supports the conclusion reached by us. True, plaintiff did not testify that she did not assert her right to this money in return for decedent's promise to will her the house. She did not need to— decedent recognized her right to it and agreed to make the will leaving it to her. A valid contract resulted. This· is clearly

established—again by decedent's own writing—when he stated, "I don't want them to know Mr. Evans left you thirty five thousand dollars too, & about that agreement we made that you keep the house with everything & I keep the money." Compare, In re Washington's Estate, 220 Pa. 204, 69 A. 747 (1908).

We have already referred to Keen v. Larson, supra, in connection with our discussion of the statute of frauds. That case also considers the sufficiency of forbearance under the facts there present as consideration to support a contract to make a will. The court had the following to say (132 N.W.2d 356-357):

"The evidence establishes that the agreement was based on a forbearance to bring suit for the enforcement of a claimed legal right. This constitutes consideration to support a promise to leave all of the property in question to the plaintiff upon his death. 57 Am.Jur., Wills, Sec. 172; Frieders v. Frieders' Estate, 180 Wis. 430, 193 N.W. 77, 31 A.L.R. 118; Murtha v. Donohoo, 149 Wis. 481, 134 N.W. 406, 136 N.W. 158, 41 L.R.A.,N.S., 246; Ashbauth v. Davis, 71 Idaho 150, 227 P.2d 954, 32 A.L.R.2d 361.

" 'The waiver of a right or forbearance to exercise the same is a sufficient consideration for a contract, whether the right be legal or equitable, or exists against the promisor or a third person, provided it is not utterly groundless.' 17 C.J.S. Contracts § 103.

"Refraining from bringing a suit may be sufficient consideration. See 17 C.J. S. Contracts § 104(1).

"Refraining from enforcing a claim which might reasonably be thought to be doubtful is a sufficient consideration. See 17 C.J.S. Contracts § 104(2).

"Nick Sekulich had no children. In fact, he had no heirs to succeed to his estate under the laws of succession. He was an immigrant who had no formal education in this country. Under the circumstances, as they existed in this case,

we find there was sufficient consideration for the agreement, that it was not contrary to reasonable probabilities, and that it was not inequitable to third persons.

"For these reasons, we believe, the plaintiff had a bona fide claim against Nick Sekulich for at least a substantial interest in the property. We need not determine whether she would have prevailed had an action been commenced and tried.

"The evidence is sufficient to establish that both persons had reasonable grounds for believing the plaintiff had a bona fide claim and that both parties acted in good faith. A compromise of a bona fide controversy constitutes a good consideration for a promise. McGlynn v. Scott, 4 N.D. 18, 58 N.W. 460; Fryar v. Cetnor, 6 N.D. 518, 72 N.W. 909; Silander v. Gronna, 15 N.D. 552, 108 N.W. 544.

"A legal detriment may be sustained by a promisee by the surrender of a legal right, whether such right has substantial value or not. Divide County v. Citizens State Bank, 52 N.D. 29, 201 N.W. 693."

Compare what was said by us in Hughes v. Betenbough, supra. In Wester v. Trailmobile Co., 59 N.M. 73, 76, 279 P.2d 526 (1955), we had the following to say concerning what constitutes sufficient consideration to support a contract:

"The general rule is stated at 17 C.J. S. Contracts § 74, as follows:

" 'It may be laid down as a general rule, * * * that there is a sufficient consideration for a promise if there is any benefit to the promisor or any loss or detriment to the promisee. It is not necessary that a benefit should accrue to the person making the promise; it is sufficient that something valuable flows from the person to whom it is made, or that he suffers some prejudice or inconvenience, and that the promise is the inducement to the transaction. * * * ' "

The consideration proved is sufficient to meet the requirements of the law. The contract was a good and valid one and should have been enforced. However, since the house has been sold and cannot be delivered, plaintiff is entitled to the agreed value placed upon it by her and by decedent, namely $35,000.00.

It follows that the cause must be reversed and remanded to the trial court with instructions to vacate the order appealed from and enter a money judgment in favor of plaintiff in the amount of $35,000.00.

It is so ordered.

NOBLE, C. J., and CARMODY, J., concur.