2008-NMSC-027

183 P.3d 151

Olga VAROZ, Personal Representative of
the Estate of Ted Varoz, Deceased,
Petitioner–Petitioner,

v.

Christina VAROZ, Personal Represen-
tative of the Estate of Edward Varoz,
Deceased, Respondent–Respondent.

No. 30,209.

Supreme Court of New Mexico.

April 15, 2008.

Miller Stratvert P.A., Ruth Fuess, Alice Tomlinson Lorenz, Albuquerque, NM, for Petitioner.

Law Offices of G. Holdt Garver, G. Holdt Garver, L. Helen Bennett, P.C., Linda Helen Bennett, Albuquerque, NM, for Respondent.

## OPINION

MAES, Justice.

{1} Ted Varoz has brought this action against Respondent, the estate of Edward "Eddie" Varoz, to enforce an oral contract to devise the family farm to Ted. A jury found that Ted and Eddie entered into an enforceable contract in compliance with the statute of frauds and awarded the farm to Ted. The Court of Appeals reversed the jury's verdict in a memorandum opinion. *See Varoz v. Varoz*, No. 25,935 (N.M. Ct.App. June 20, 2006). The Court of Appeals held that the documents introduced at trial are insufficient to satisfy the statute of frauds. This Court granted certiorari. We find that the letters introduced at trial satisfy the statute of frauds and affirm the jury's verdict.

## FACTS

{2} The issue on appeal arises out of an alleged oral agreement between two brothers, Eddie and Ted Varoz, as to the ownership of the family farm in El Rito, New Mexico, located in Rio Arriba County. After Eddie's death, Ted filed a Petition to Enforce Claims in the probate court. Ted alleged that he and Eddie had entered into an agreement in which Ted and another brother, Tito, would transfer their interests in the El Rito farm to Eddie, and Eddie would devise the farm to Ted if Ted survived Eddie. Ted argued that Eddie breached this agreement by devising the farm to Eddie's daughter, Christina Varoz—Respondent and personal representative of Eddie's estate. Christina challenged Ted's claim, and the case was transferred to the Second Judicial District court for a jury trial to determine ownership of the farm.

{3} Christina filed a motion in limine to exclude from evidence two letters from Eddie to Ted, written in 1954 and 1956, and any extrinsic or parol evidence as to the terms of the alleged contract. The motion argued that the letters do not contain the required elements to prove the existence of a contract because "[n]either letter provides a description of the property," "[n]either letter explains the parties to the alleged contract," and "[n]either letter explains the terms of the alleged contract."

{4} The trial court denied the motion and allowed the letters and testimony into evidence. At trial, Olga Varoz, Ted's wife, testified to certain aspects of the family's history with the El Rito farm including its devise to Ted and Eddie from their father, and that in 1954 the farm was the only piece of land held jointly by the brothers. Olga Varoz also testified to her understanding of an agreement between Eddie and Ted in which the brothers agreed that Ted would transfer his interest in the El Rito farm to Eddie, to allow Eddie to benefit from a Veteran's tax exemption, and Eddie would devise the property back to Ted if Ted survived Eddie.

{5} Through Olga, Petitioner introduced the previously disputed 1954 and 1956 letters, and a quitclaim deed dated April 1956, assigning Ted and his brother Tito's interests in the farm to Eddie. The 1954 letter from Eddie to Ted reads in its entirety as follows:

Dear Ted:

I was unable to visit you folks this month, but I trust that you are all fine. However, I expect to visit in New Mexico around Easter.

My main concern during this coming visit is to bring, with your co-operation, a fair and satisfactory conclusion, to all concerned, the unsettled and neglected state of affairs relative to our property in Rio Arriba County.

Since our beloved Mother's death I have paid taxes on the property which is still in her name. Because of tax exemptions given to veterans from New Mexico I feel we must take advantage of this benefit and make arrangements to have a clear title and record in one of our names.

Since I have been paying the taxes and feeling I have Tito's and your confidence I suggest that it be placed in my name so I can get the tax exemption on the property.

At present I have no family responsibilities and because it would seem, to me, more logical to change the title to my name in that I will be willing to pay for such a change. This way it will save me, in the long run, from paying taxes as I have in the past.

Since we don't know if we want to sell the property or not, I want to avoid continuing tax payments as I have in the past when we could have avoided it. Also I find that the taxes are going higher from year to year. It is easy to see that I lose money this way.

I am open to any suggestions you and Tito may have concerning this matter; but we must change the title which should have been done many years ago. The more we wait the more the expense for a change. I hope we can settle this while I am in New Mexico.

I like to know how everyone is. I hope you are all well. I hope to hear from you in the near future.

> Cordially, your brother,
>
> /s/ Eddie

Ted and Tito executed the quitclaim deed giving Eddie full interest in the property in April of 1956. Subsequently, Eddie wrote to Ted explaining his intention to devise the property to Ted, and apparently sending Ted the deed to the farm:

Dear Ted,

Enclosed is the land deed and it is important that you keep it in a safe place with your other valuable papers. I will designate you as my beneficiary of the land in my last will and testament duly probated so that it will take effect if you survive me.

. . . .

> Regards to everybody,
>
> /s/ Eddie

The trial court admitted these letters over Respondent's objections.

{6} The jury instructions required the jury to determine whether an agreement existed between Ted and Eddie based on the written documents introduced at trial.

INSTRUCTION NO. 5

In this civil action the Petitioner seeks conveyance of land from the estate of the decedent/Respondent which Petitioner claims was promised to him if he deeded the property in which he had a one-third interest over to decedent and if petitioner survived decedent.

To establish the claim Petitioner has the burden of proving the following contention that Petitioner and decedent entered into an agreement or contract as follows:

1) If Petitioner would convey his interest over to his brother ("the decedent") in exchange for his brother ("the decedent"), making a will which would convey the entire interest in the property in question to Petitioner, if Petitioner survived decedent.

2) In order to establish this agreement, Petitioner must utilize a written document or multiple written documents signed by the decedent which states each of the elements of the agreement.

3) The elements which must be established by clear, convincing and satisfactory evidence are:

a. The parties to the agreement

b. The land to which this agreement relates

c. The terms of all the promises constituting the agreement

{7} The jury ruled in Ted's favor. In a special verdict form the jury found that Ted and Eddie agreed that if Ted conveyed his interest in the farm to Eddie, Eddie would leave the entire farm to Ted in his will; that Eddie breached this agreement; and that Ted is entitled to the farm instead of Christina. According to the jury instructions, the jury based its determination that Eddie and Ted entered into an agreement solely on the 1954 and 1956 letters because these were the only documents with Eddie's signature.

{8} The Court of Appeals relied on pre-Probate Code case law setting forth the proof requirements for an oral contract falling within the statute of frauds. *See Varoz v. Varoz*, No. 25,935, slip op. at 5–6 (N.M.

Ct.App. June 20, 2006). On certiorari, Ted argues that the statute of frauds does not apply to the agreement between Ted and Eddie because the agreement was a unilateral contract that was accepted by Ted's full performance by quit claiming his interest in the farm to Eddie. Alternatively, Ted argues that even if the statute of frauds applies, the letters were sufficient to satisfy its requirements. Because we agree that the letters are sufficient to satisfy the statute of frauds, we need not discuss Petitioner's first argument.

## DISCUSSION

{9} Initially, we note that the current Uniform Probate Code contains a provision that governs contracts concerning succession. NMSA 1978, § 45–2–514 (1993). However, Section 45–2–514 applies only to contracts "executed after the effective date of [that] article," which was July 1, 1993. Similarly, the predecessor to Section 45–2–514, NMSA 1978, § 45–2–710 (1975), only applied to contracts "executed after the effective date of the Probate Code," which was July 1, 1976. The contract in the instant case was allegedly formed sometime between 1954 and 1956, and thus the Probate Code does not apply to that agreement. Consequently, we look to New Mexico case law decided prior to the enactment of the Probate Code in evaluating the alleged contract to make a will in this case.

{10} On appeal, we are concerned only with the sufficiency of the 1954 and 1956 letters to satisfy the statute of frauds as memoranda of an oral agreement. The parties do not dispute the letters' exact wording, and this Court is in as good a position to evaluate them as the jury was at trial. Therefore, we evaluate the sufficiency of the letters de novo. *See In re Estate of Armijo*, 2001–NMSC–027, ¶ 7, 130 N.M. 714, 31 P.3d 372 (reviewing de novo whether the language of a will itself evidenced the existence of an agreement to make a will, stating, "[t]here is no difference between the ability of this Court to review the will and that of the trial court"); *Kirkpatrick v. Introspect Healthcare, Corp.*, 114 N.M. 706, 711, 845 P.2d 800, 805 (1992).

{11} Our analysis of the instant case depends upon two of this Court's earlier opinions: *Pitek v. McGuire*, 51 N.M. 364, 184 P.2d 647 (1947) and *Aragon v. Boyd*, 80 N.M. 14, 450 P.2d 614 (1969). In *Pitek*, this Court set forth the following rules governing oral contracts that fall within the statute of frauds: (1) the oral contract must be evidenced by "some writing subsequently made however informal, stating each of its essential elements, signed by the person to be charged," *id.* at 371, 184 P.2d at 651; (2) such writing or writings must state with reasonable certainty (a) each party to the contract, (b) the land or goods to which the contract relates, and (c) "the terms and conditions of all the promises constituting the contract," *id.* at 371, 184 P.2d at 651–52; and (3) if writings made prior to the making of an oral contract are offered to prove the existence of the contract, they must be referred to in a memorandum made subsequent to the transaction, or otherwise "show that they each relate to the transaction to be proved," *id.* at 375, 184 P.2d at 654. Applying these rules, the Court in *Pitek* determined that letters written prior to an oral contract for the sale of land could not be used to explain subsequent written memoranda of the transaction because the memoranda did not refer to the prior letters. *Id.* at 375–77, 184 P.2d at 654–55.

{12} In the instant case, the Court of Appeals relied on *Pitek* in concluding that the 1954 and 1956 letters from Eddie to Ted did not satisfy the statute of frauds because the letters could not be "read together to evidence the essential terms of the contract, as required by *Pitek.*" *Varoz v. Varoz*, No. 25,935, slip op. at 7. Specifically, the Court of Appeals read each letter as containing one side of the purported transaction—the 1954 letter showing that Ted would transfer his interest to Eddie and the 1956 letter showing that Eddie would devise the property to Ted in his will—but without indicating that each promise was intended to be part of a transaction. *Id.*

{13} While *Pitek* displays a fairly technical application of the statute of frauds, that case must be read through the lens of the later case, *Aragon*, which demonstrates a

somewhat more flexible approach to interpreting written memoranda of an oral contract, in the context of an oral contract to make a will. In *Aragon*, we explained that,

[t]he statute [of frauds] is not pressed to the extreme of a literal and rigid logic. The statute of frauds is intended to protect against a fraud, but it is not intended to be taken as an escape for those seeking to avoid their obligations. It must be remembered that the memorandum, sufficient to satisfy the statute of frauds, need not in itself amount to a contract.

*Id.* at 17, 450 P.2d at 617 (quoted authority omitted). This statement makes further sense when viewed in light of the factual circumstances present in *Aragon*, which, like the instant case, involved a contract to make a will, and unlike *Pitek*, which did not involve that type of contract. In *Aragon*, the parties to the contract were close family members with a long history together, as opposed to the unrelated parties who made the real estate contract in *Pitek*. *Aragon*, 80 N.M. at 15, 450 P.2d at 615. Further, unlike *Pitek*, which involved purely prospective expectations relating to a contract for the sale of land, *Aragon*, like this case, involved an expectation over many years that a close family member would devise the property in his will, and significant conduct in reliance on that alleged promise. *id.* at 15–16, 450 P.2d at 615–16. In cases involving closely related parties where expectations have existed for long periods of time, and where actions are taken in reliance on a purported agreement that are difficult to explain in the absence of such an agreement, a less formalistic approach is appropriate when interpreting writings submitted as evidence of that agreement. *id.* at 19, 450 P.2d at 619 (questioning what possible reason "could be advanced for the decedent's insistence that plaintiff pay for curtains put in the house if it was not because of an understanding that it was to be hers"). For these reasons, we find *Aragon* to be more useful than *Pitek* in analyzing the facts of this case under the statute of frauds.

{14} In *Aragon*, this Court considered whether the plaintiff had presented sufficient memoranda to satisfy the statute of frauds and establish an oral contract for the devise of certain property. *Id.* at 17, 450 P.2d at 617. In that case the plaintiff sought damages for the decedent's breach of a contract to devise a house to the plaintiff. The plaintiff had two theories by which she argued that she and the decedent had entered into an enforceable agreement. The first theory was that decedent agreed to devise the house to the plaintiff in return for the plaintiff forgoing her right to a cash inheritance. *Id.* at 15, 450 P.2d at 615. The plaintiff's second theory was that the decedent promised to devise the house to the plaintiff in return for the plaintiff cleaning the house and making it easier to keep for the decedent. *Id.* The Court in *Aragon* considered several letters between the plaintiff and the decedent as memoranda of these agreements. The first letter was from the decedent (Slaughter) to the plaintiff (Julia):

Julia you said Spiegel was yapping for the money of the curtains you put here in the house when I show you & Abel that Will I made you for the house. I told you it was good as gold if help me get the house in shape so it be easy to keep clean. That was done & settled. You pay for the curtains.

*Id.* The plaintiff wrote to the decedent in the second letter:

I sent that envelope with the *will* and the *Oil Contract*. Abel is still wondering, why you put his social security number on that *Oil Contract* that you made. Really Slaughter, we don't want to accept that Contract of those Oil Royalties, because that comes from your folks. We don't think that is right, As for the *Will*, that was Uncle Dume's [Mr. Evans] property, and by right it will belong to me after you are gone. So we rather for you not to register that contract, like you said you were going to. As for the house, you said in your letter that a Contract is better than a WILL and if you sell it now for sixty thousand dollars and make sure they will not tear it down until after you die, then you can do that if you think that it is better for me. The main thing, is that you stay in that house as long as you live and if you get to the point that you can't take care of yourself, you come and live with us and they can go ahead and tear it then.

*Id.* at 15–16, 450 P.2d at 615–16 (alteration in original). And decedent replied,

> I received the Will & oil contract. If you decide to sell the house send me a short note that you want to sell the house. I will need that. That oil Co. is still wanting to buy the house. They will give you sixty thousand dollars & int. ten thousand a year. That's a good deal.
>
> Julia my folks are putting a lot of pressure don't know what to do. I don't want them to know Mr. Evans left you thirty five thousand dollars too. & about that agreement we made that you keep the house with every thing & I keep the money, for your own good keep your mouth shut.

*Id.* at 16, 450 P.2d at 616.

{15} The Court found that these letters were sufficient memoranda of an oral agreement between the plaintiff and the decedent by which the decedent agreed to leave the house to the plaintiff:

> [W]e do not understand how it can be asserted, in the light of the language quoted above, that there was no understanding between the parties that the house had been willed to plaintiff by decedent in compliance with some instruction concerning a gift of $35,000.00 intended for her by Mr. Evans, and by descent having come into the hands of decedent, or in fulfillment of an agreement to leave the house to plaintiff in exchange for her having cleaned it and made it easier to keep, during her stay with decedent in the summer of 1963. What else could be the meaning of, "that was done and settled you pay for the curtains." There could be no possible theory upon which plaintiff should pay for curtains put into the Clovis house, except that the house was hers or was to become hers.

*Id.* at 17–18, 450 P.2d at 617–18.

{16} We do not require written memoranda of an oral contract to contain all the necessary elements or the requisite specificity of an actual contract. When the agreement itself is oral, memoranda satisfy the statute of frauds if they amount to "some writing subsequently made however informal, stating each of its essential elements, signed by the person to be charged, or by his authorized agent acting for him." *Pitek,* 51

N.M. at 371, 184 P.2d at 651. As in *Aragon,* we find that the letters introduced by Petitioner at trial in the instant case sufficiently state each of the essential elements of the agreement to satisfy the statute of frauds.

{17} There is no dispute that the letters identify Ted and Eddie as the parties to the contract, and thus the first essential element of the contract, as set forth in *Pitek,* is present. With regard to the second essential element—the description of the land to which the contract relates—where the underlying contract is oral, a more general description of the land than what we require for a deed or conveyance of property is permissible. *See Adams v. Cox,* 52 N.M. 56, 59, 191 P.2d 352, 355 (1948) (finding that the description of a piece of property as "Lighthouse Laundry with all equipment complete together with two city lots 100 × 168 ft," was sufficient where the memorandum placed the property in Roswell, New Mexico); *but see Rhodes v. Wilkins,* 83 N.M. 782, 784, 498 P.2d 311, 313 (1972) (finding that the description of land as "approximately 1.862 acres" was not reasonably accurate because "there was no reference in the contract to any means or data by which these 1.862 acres could be identified"). The 1954 letter describes the property as "our property in Rio Arriba County." This is sufficient identification of the property because there is no other reasonable interpretation of this statement that might identify some other property. At the time Eddie wrote this letter, there was no other property that the brothers owned jointly, in Rio Arriba County or elsewhere, to which this statement might apply. Furthermore, the Varoz family has a long history and is intimately familiar with this property, which obviates the need for a more technical description.

{18} The letters also sufficiently satisfy the third element by stating "the terms and conditions of all the promises constituting the contract and by whom and to whom the promises [were] made." *Aragon,* 80 N.M. at 17, 450 P.2d at 617 (internal quotation marks omitted). The 1954 letter sets the terms of performance for Ted, as well as the intended benefit to Eddie by allowing Eddie to take

advantage of a veterans' tax exemption. The 1956 letter shows Eddie's promise to devise the property to Ted, which was Eddie's only obligation in this agreement. This letter and the apparent enclosure of the deed to the farm evidence a promise to devise the property to Ted in exchange for Ted's agreement, already performed, to transfer his interest in the farm to Eddie. These letters do not amount to a contract themselves, but together they contain all the required elements of written memoranda of an oral agreement. Accordingly, we find that this matter was properly submitted to and decided by the jury.

## CONCLUSION

{19} For the reasons stated, we reverse the Court of Appeals and affirm the jury's verdict.

{20} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, RICHARD C. BOSSON, CHARLES W. DANIELS, Justices.

EDWARD L. CHÁVEZ, Chief Justice (dissenting).

CHÁVEZ, Chief Justice (dissenting).

{21} Because the documents admitted into evidence are insufficient as a matter of law to satisfy the statute of frauds as set forth in both *Pitek v. McGuire*, 51 N.M. 364, 184 P.2d 647 (1947) and *Aragon v. Boyd*, 80 N.M. 14, 450 P.2d 614 (1969), I respectfully dissent. The 1954 letter precedes the alleged oral agreement, and must therefore be referred to in subsequent writings for it to be considered evidence of an agreement. Neither the quitclaim deed written over two years after the 1954 letter nor the 1956 letter refers to the 1954 letter. In addition, the 1956 letter does not suggest an agreement supported by consideration. In *Aragon*, the case on which the majority relies, it was clear from the exhibits alone that the plaintiff had both foregone the right to receive cash and volunteered her time and money to clean and repair the property she was told she would inherit. 80 N.M. at 19, 450 P.2d at 619. This case is very different in that none of the documents admitted into evidence mention the promises made by each of the parties to the alleged agreement. In my judgment, we should require at least as much as was required in *Aragon* to override the provisions of a last will and testament. In this case, none of the parties to the alleged oral agreement testified at trial. Eddie and Tito are deceased, and Ted did not testify about his understanding of the oral agreement. Moreover, Ted returned the land deed referred to in the 1956 letter to Eddie, and according to the testimony of Olga Varoz, Ted's wife, Eddie declined to convey the land to Ted by deed during Eddie's life, despite their repeated requests.

{22} Eddie Varoz died on September 15, 2000, survived by his only child, Christina Varoz. On July 7, 1988, Eddie executed a last will and testament, which left all of his property to his only daughter. The property that is the subject of this appeal was land in northern New Mexico that had originally belonged to Eddie's parents which has been vacant since the death of Eddie's mother. Despite a tax deed that conveyed the subject property to the three siblings who were the heirs of Mrs. Eduardo Varoz, Eddie was the only sibling who paid the property taxes. When Christina Varoz attempted to probate her father's will, Ted Varoz, her only living uncle on her father's side, sought to disinherit her of the subject property, claiming that before her birth, her father had agreed to give Ted the land if Eddie predeceased him. Ted claimed that Eddie agreed to give up his interest in the land because Ted agreed that Eddie could have title to the property exclusively in his name so that Eddie could benefit from a veteran's exemption while Eddie continued to pay all of the property taxes. Therefore, according to Ted, Eddie agreed to pay all of the property taxes on the land for the rest of his life, and also agree that if he died before Ted, Eddie would leave all of the property to Ted. To support this alleged agreement, Ted introduced at trial the two letters quoted in the majority opinion.

{23} Although the majority acknowledges that an oral agreement to make a will must be evidenced by a *subsequent* writing, the Court relies almost entirely on the 1954 letter, which by its own terms preceded any oral agreement. Such reliance would not be

in error if, as the majority opinion expresses, writings subsequent to the oral agreement either refer to or show how the writing made before the alleged agreement relates to the oral agreement. In this case, neither the quitclaim deed signed two years after the 1954 letter nor the July 9, 1956 letter refers to the 1954 letter or shows how it relates to the alleged oral agreement.

{24} More importantly, the documents on which the majority relies should not have been admitted into evidence because, as pointed out by the Court of Appeals, they do not memorialize a transaction. Eddie paid the property taxes all along, a responsibility that was not exclusively his. If there had been a default in payment of the property taxes, all of the siblings would have lost the property. In addition, Ted's wife testified that Ted never intended to convey his interest in the property to Eddie, he simply wanted the title to be in Eddie's name so that Eddie could pay lower property taxes by virtue of his veteran's exemption. As Ted's wife explained, Ted agreed to sign the quitclaim deed, saying that he was doing so on "condition that it is still partly mine. I'm also an owner to this land."

{25} After reading the documents and reviewing the trial testimony, I believe that Ted never intended to give up his interest in the land. However, I cannot agree that the documents support an agreement that Eddie would pay all of the property taxes on the land and then simply convey his interest to Ted without consideration. For the foregoing reasons, I would affirm the Court of Appeals and remand to the district court to enter judgment in favor of Christina Varoz.