289 P.2d 628

J. S. STITES, Plaintiff-Appellee,

v.

Harold C. YELVERTON and Joe B. Hoskins, a co-partnership, d/b/a West Texas Builders, Defendants-Appellants.

No. 5958.

Supreme Court of New Mexico.

Nov. 4, 1955.

James M. H. Cullender, Roswell, for appellee.

McGHEE, Justice.

This is an appeal by defendants from a judgment awarding the plaintiff $6,700 for breach of contract. The plaintiff is a plumbing and heating contractor; defendants are general contractors. It was claimed by the plaintiff, and the trial court found, that a contract had been entered into between the parties to this action upon acceptance by the defendant of plaintiff's bid for a sub-contract to furnish the materials for and to perform the labor upon the plumbing, heating and ventilation work for two public school buildings in Roswell, New Mexico, for which defendants were general contractors.

As summarized, the findings of fact made by the trial court were as follows:

Some time before October 1, 1953, the Roswell Board of Education advertised for bids on construction of two school buildings, said bids to be based upon plans and specifications drawn by a firm of architects. The defendants advised the plaintiff they were submitting a bid on the project and urged the plaintiff to submit a bid to them for a sub-contract on the plumbing, heating and ventilation work on the schools. On the above mentioned date the plaintiff submitted a written bid on such work for $56,700 and the defendants used this bid in submitting their own bid for the general

Hervey, Dow & Hinkle, Howard C. Bratton, Roswell, for appellants.

contract, listing plaintiff as their sub-contractor.

When the bids on the general construction contract were opened by the school board, the afternoon of October 1, 1953, it was determined that the defendants had the lowest bid. At that time, or a few minutes later, the defendant Yelverton saw the plaintiff and informed him he was accepting plaintiff's bid for the sub-contract, assuring the plaintiff that when the school board gave the defendants the contract that they would give the plaintiff a sub-contract on the plumbing, heating and ventilation.

The school board accepted the bid of the defendants and awarded the general construction contract to them. On October 5, 1953, the defendant Yelverton went to the plaintiff's place of business and tried to induce the plaintiff to reduce his bid for the sub-contract to a figure some $2,000 below the bid made. The plaintiff refused to do so and thereafter, without any notice to the plaintiff, the defendants arranged with another plumbing and heating contractor to do the work of supplying and installing the necessary equipment for the schools.

At no time after the opening of the bids by the school board did defendants mention or request any further terms, conditions or requirements as a condition precedent to the execution of a formal sub-contract with the plaintiff, or the performance by him of his offer as contained in the bid, except for the effort made to induce plaintiff to lower the bid.

The plans and specifications prepared by the architects on which all bids were made were very detailed and covered all possible conditions of the project; the plaintiff's bid and the acceptance thereof by the defendants contemplated all of these details and conditions.

The trial court concluded that plaintiff's offer as submitted to defendants on October 1, 1953, constituted a valid offer by him to supply and install the plumbing, heating and ventilation equipment on the school projects, as contained in the plans and specifications prepared by the architects, and that the defendant accepted plaintiff's offer on that day, at which time the same ripened into an enforceable contract, for a breach of which defendants were liable in damages.

The defendants contend on this appeal that the lower court erred in determining there was a contract between the parties—that the bid of the plaintiff was not accepted; that the negotiations between the parties were merely tentative; that the parties contemplated the execution of a written sub-contract and did not intend to be bound until its execution; that terms which would have been essential and material to the sub-contract were never agreed upon by the parties.

Counsel for the parties appear to be in general agreement as to applicable rules

of law: Parties to an oral, informal agreement may or may not become bound prior to the execution of a contemplated formal writing, depending upon their intention to be or not to be so bound. What is intended is a question of fact depending upon the circumstances of the case. Among the circumstances to be considered are: Do the negotiations indicate a written draft was intended as the binding expression? Is the contract of a type usually put in writing? Has there been agreement upon all of the essential and material terms of the contract? Rosenfield v. United States Trust Co., 1935, 290 Mass. 210, 195 N.E. 323, 122 A.L.R. 1210, and annotation following, supplemented in 165 A.L.R. 756; 12 Am.Jur. (Contracts) §§ 24, 25; Restatement of the Law, Contracts, § 26.

Because the case is what might be termed a "close" one, and because the correctness of the ruling made depends upon consideration of the circumstances involved, it is necessary to examine the evidence in some detail.

It should be stated at the outset that the plans and specifications of the architects included lengthy and detailed general conditions defining the rights of contracting parties under the contract to be given. Article 37 of the general conditions related to the rights between contractor and sub-contractor; the substance of these conditions will be described in a further paragraph.

The requirements as to the plumbing and heating and the ventilation work are contained in divisions 20 and 21 of the plans and specifications, covering some twenty pages of typewritten matter. It is not disputed that the bid of the plaintiff for the sub-contract was made in contemplation of and in compliance with these plans and specifications and the general conditions. There was, therefore, no uncertainty as to the subject matter of the sub-contract bid upon by plaintiff.

On September 17, 1953, the defendants, by post card, requested a proposal from the plaintiff for all material and work for plumbing and heating on the school project. Later an engineer representing the defendants came to the office of the plaintiff in Roswell and reminded him to get in his bid. The plaintiff was making estimates for submission to several general contractors who planned to make a bid upon the project.

After these opening negotiations, the next contact between the parties was on October 1, 1953, when the plaintiff and the defendant Yelverton met in a hotel in Roswell. They had a few minutes of conversation during which the plaintiff made a bid of $57,000 for the plumbing, heating and ventilation work on the schools, based upon and covering the matter relating to those items in divisions 20 and 21 of the architects' plans and specifications. The plaintiff had made a note of his bid in a pocket memorandum book, and while talking with Yel-

verton he copied off the figures on another note paper which he handed to Yelverton. The slip of paper given Yelverton was lost, but the handwritten memorandum of the bid which the plaintiff retained was introduced in evidence. It read as follows:

```
 'Elementary Schools
 No. 1 30,271.85
 No. 2 27,411.08
 No. 3 57,000.00
 Sec. 20 Plbg
 V 21 H & V.
 Tax Inc"
```

Numbers one and two of this memorandum and the figures following were bids for the work on the separate schools, made in the event they should be let separately, while number three was the combined bid for the work on both schools. Counsel for the defendants, at the time of the introduction of this memorandum, admitted the figures on the instrument were the figures submitted.

The plaintiff and Yelverton had no further discussion at that time, but a short while thereafter Yelverton received a bid of $56,900 from another plumbing and heating contractor. Yelverton contacted the plaintiff and informed him it appeared his bid was being undercut. The plaintiff then orally told Yelverton to cut the bid to $56,-700.

After these events had transpired, and later the same day, the bids were opened by the school board and it was evident that defendants were the lowest bidders on the two schools combined. After the opening, the plaintiff, along with several others present, approached Yelverton and congratulated him. Then the plaintiff and Yelverton had a brief conversation during which plaintiff asked Yelverton how he (plaintiff) stood and Yelverton replied, "You are all right, we used your bid; we listed you on the bid we turned in and when I get a contract I will give you a sub-contract." Then the plaintiff stepped back from Yelverton so that other people in the crowd around Yelverton could talk to him. The plaintiff sent to Yelverton, on the same day, a confirmation bid.

During the week following, Yelverton went to the plaintiff's office and told him he might not be able to go ahead with plaintiff as plumbing and heating contractor on the schools, stating that some objection to the plaintiff as sub-contractor had been raised by the architect and the school board. Some further conversation ensued and finally Yelverton told the plaintiff that the architect and the school board had approved him at that time. The next day Yelverton came to see the plaintiff again and told him he had a better figure offered from another plumbing and heating contractor in Roswell, W. B. Lum Company, by some $1,900, and asked the plaintiff if he could lower his bid. The plaintiff said he did not think he should be asked to do so. Yelverton then wanted the plaintiff to sign a statement

that he would make up the difference between the two bids in buying material and would get his suppliers to cut their prices. The plaintiff told Yelverton he could pick up $500 of the $1,900, but that he would not do it for his own benefit as it was not ethical. Yelverton left the office after asking the plaintiff to write to him and let him know what he had found out. Plaintiff did talk with one of his suppliers and then wrote a letter to Yelverton containing the following matter:

"As you requested I have contacted Mr. Frank Winsett, Manager of Clowe and Cowan, here in Roswell and laid the cards on the table. His answer was as I expected; that they had quoted the best price possible on their original quotation and that if he had not quoted his best price he would not lower it only to have the difference go to a General Contractor, especially after he stood in the room after the bid opening and heard you tell me you had used my figure on the plumbing and heating and would send me a contract as soon as you received yours from the School Board, and he also heard you tell Mr. Tom Ragsdale of the W. B. Lum Plumbing & Heating Co. that you were sorry that he did not get his bid to you before the letting because it was too late after the letting as you had used my figure and listed me as

plumbing and heating contractor on your bid sheet.

"In as much as you told me in my office Monday afternoon and Tuesday morning that the School Board and the Architects preferred the W. B. Lum Co. to be the sub-contractor on the plumbing and heating over me I have contacted Mr. Gene Reischman, President of the School Board, to find out for myself if my present work on the new Senior High School Building was not satisfactory or if it was why the W. B. Lum Co. would be given preference over me. He assured me that my work was very satisfactory and so far as he knew I was going to do the work on the Elementary Schools as I was listed as the plumbing and heating sub-contractor on the bid sheet. He also told me that the question of the W. B. Lum Co. had never come up and said that I could quote him as saying that W. B. Lum Co. would not be given preference over me in any way.

"I have also contacted Mr. Roy Vorhees, Architect, as I have done work for him before and am doing work for him now to see if he was dissatisfied or if there was any reason why he might prefer W. B. Lum Co. over me. Mr. Vorhees assured me that my work had always been satisfactory

and that he did not prefer W. B. Lum Co. over me.

"I am very sorry that this unpleasant situation has come up but feel sure that if you will take care of your moral obligation to me and send me a contract as originally agreed it will be forgotten and the job will progress to the best interest of all concerned.

"Mr. Vorhees informed me yesterday that your contract was being mailed, therefore I will appreciate a sub-contract on plumbing & heating at your earliest convenience."

On October 12, 1953, Yelverton answered the letter of the plaintiff. The first paragraphs of Yelverton's letter charged the plaintiff with making a misrepresentation by stating in his letter that Yelverton had told him the school board and the architect preferred the W. B. Lum Company, and accusing the plaintiff of having a "holier than thou attitude" and being generally uncooperative. Aside from these matters, the letter stated:

"I would like also to point out that the Lum Company is entitled to consideration due to the fact that they actually had the lowest bid for plumbing and heating on this job. Their efforts in preparing this bid should not be entirely disregarded. The only reason I did not have and did not list them as our subcontractor for this job was

due to the last minute confusion that surrounds a bid opening of this sort.

"It is our definite policy not to bid shop after the award of contract, but we feel that under the circumstances surrounding this bid, that we are at liberty to choose the most desirable person to deal with.

\* \* \* \* \* \*

"In view of the factors brought out above, I intend to further investigate this matter and will let you know my ultimate decision at some later date."

After this exchange of letters there were no further transactions between the parties. The defendants gave the contract for plumbing and heating to W. B. Lum and Company.

The president of the Roswell school board testified as follows:

"A. \* \* \* Yelverton appeared before the Board and requested permission to change a sub-contractor from Mr. Stites to Mr. Lum. The Board at first was reticent to allow the change. We felt Mr. Stites was listed in the original contract as a subcontractor and so far as the Board of Education was concerned we had no objection to either Mr. Stites or Mr. Lum and we had no reason to want to change it. At a later meeting and after Mr. Yelverton was insistent that

the change be made it was allowed to be made by the Board of Education.

"Q. In the course of any of that conversation was there a question of the general contractor trying to get the sub-contractor to reduce the price ever discussed? A. Yes, sir, I believe it was.

"Q. Do you remember the substance of the conversation? A. Only in general, that we felt it was a bad practice to peddle bids and that we wanted to discourage it, if possible, for moral reasons.

"Q. Did Mr. Yelverton tell the Board that Mr. Lum's bid was a lower amount than Mr. Stites? A. Either by statement or implication I believe it was indicated that Mr. Lum's bid was less.

"Q. Was anything ever said about what would happen to any saving that might be made in case a change was made? A. Yes, sir, in our refusal to make a change we stated if a change was made we said we would allow the change only if ninety percent of the saving between the two contracts was passed on to the Board of Education.

"Q. Was that the way it was finally allowed and arranged? A. No, sir, it was later changed in view of the fact either contractor was acceptable, and we thought we had no particular ground to stand on; in our eyes the two plumbing contractors were equal and we thought we had no ground to hold that action."

In detailing the circumstances of this case we have treated the matter from a chronological standpoint. However, it was and is the contention of plaintiff that a contract was formed upon Yelverton's acceptance of the bid of the plaintiff immediately after the opening of the bids by the school board, when he said, "You are all right, we used your bid; we listed you on the bid we turned in and when I get a contract I will give you a sub-contract." Therefore, all matters occurring afterward are material only as they tend to show what the understanding and intention was.

The circumstances relied upon by the defendants to show it was not the intention of the parties to enter into a binding contract, or their understanding that one had been formed, are, generally, that the bid of the plaintiff was made informally; that no terms or conditions of the work were discussed other than the fact that the bid covered divisions 20 and 21 of the plans and specifications for the project; that the casual remark of the defendant made after the bid opening could not have amounted to a formal acceptance of plaintiff's bid; that the plaintiff sent the defendants a "confirmation bid" after the statement re-

lied upon had been made; that plaintiff attempted to obtain a lower price from one of his suppliers in order to reduce his bid to Yelverton; that plaintiff wrote to Yelverton asserting Yelverton had a "moral obligation" to continue with plaintiff's sub-contract; that the parties contemplated execution of a written sub-contract.

Opposed to these circumstances are the following matters relied upon by the plaintiff. The bid, although informal, was complete and expressly covered all plans and specifications of the architects' requirements; the offer was made in view of the general conditions of the school board contract; the response of Yelverton, "* * * when I get a contract I will give you a sub-contract," related to the offer based upon detailed plans and specifications; the circumstances of Yelverton's attempts to get the plaintiff to reduce his bid; the circumstance that there was never any dispute between the parties over any matter with regard to the contract, other than the amount of the bid; the fact that the defendants never mentioned or requested any further terms or requirements as conditions precedent to the execution of the formal sub-contract.

 We believe, viewing the evidence in the light most favorable to the plaintiff under the rule so often announced by this court, that there is substantial evidence to support the findings and judgment of the lower court.

The defendants have cited many authorities in support of their contentions, especially the cases of Klose v. Sequoia Union High School Dist., 1953, 118 Cal.App.2d 636, 258 P.2d 515; Barrelli v. Wehrli, 1908, 121 La. 540, 46 So. 620; Donnelly v. Currie Hardware Co., 1901, 66 N.J.L. 388, 49 A. 428; R. J. Daum Const. Co. v. Child, 1952, Utah, 247 P.2d 817, 820.

While these cases are well reasoned, they do not persuade us that the decision of the trial court was erroneous because in each of them the circumstances varied in some substantial particular from the circumstances before the court in this case. For example, in the Daum Construction Co. case, where a general contractor sued a sub-contractor for failure to sign a written contract and perform the work, it appeared that a sub-bid was requested and made for government construction work. After the bid opening the general contractor was found to be low bidder and the sub-bidder was notified of such fact and given to understand that when and if the contract was awarded to the general contractor, a sub-contract would be submitted to the defendant sub-bidder. However, when the proposed written contract was sent to the defendant he refused to sign because he objected to some of its terms. The court said:

"There is no claim that appellant [general contractor] expressly accepted respondents' [sub-bidder] offer ei-

ther orally or in writing prior to appellant's proposed written contract. Child testified that he was told if appellant was awarded the Government contract he would probably be furnished a form of contract. Riding [superintendent of general contractor] testified positively that the last negotiations before the proposed written contract was received by Child were only preliminary, and no contract had been agreed upon. This evidence not only shows that there was no express acceptance but both parties considered that there had been no implied acceptance."

The difference is, therefore, that in the present case the party attempting to prove the contract does rely upon an oral acceptance prior to the execution of a written contract.

A situation somewhat similar to the case before us was considered in the case of Duggan v. Matthew Cummings Co., 1931, 277 Mass. 445, 178 N.E. 825, 826. There the plaintiff sent a written proposal to the defendant offering to erect structural steel in a building, at a price of $17 a ton on terms therein stated. A month later the defendant wrote to the plaintiff stating, "We hereby accept your proposition to erect the structural steel at the Administration Building, City Hospital. Please come into the office and we will draw up our standard form of contract.". The proposal, or bid, of the plaintiff set out certain terms and left others blank. The blank terms and their effect upon the creation of the contract are discussed in the following language from the opinion:

"A finding that a contract was made, as alleged in the declaration, was warranted. The written proposal of May 4, 1930, if made by the plaintiff to the defendant, as seems to be undisputed, amounted to an offer for a contract. The failure of the plaintiff to include therein an estimate of the amount of steel required for the work, and to fix the times at which portions of the work were to be completed, and the day of the month upon which each monthly payment was to be made, did not prevent this proposal's being an offer. Such provisions were not essential elements of an offer since without them an offer, if it ripened into a contract, was not too indefinite for enforcement.

"Nor was the proposal indefinite because the price fixed was stated to be 'based on the present scale of wages.' This statement in the proposal was an explanation of the provision that the price was 'subject to prompt acceptance.'

"The letter of June 4, 1930, was in terms an acceptance of this offer and did not purport to make acceptance conditional upon the execution of the

defendant's 'standard form of contract.'
* * *"

We believe that in the case before us, as in the above Massachusetts case, a finding that a contract was made was warranted.

 It would unduly lengthen this opinion to set out the provisions of the general conditions of the school project relating to contractor and sub-contractors, but these conditions are detailed and serve to bind the sub-contractor to the performance assumed by the general contractor to the owner, and to bind the contractor to the sub-contractor for obligations that the owner assumed to the contractor. Minimal provisions for method and time of making payment to the sub-contractor were made. There was also provision for arbitration. It is true that the parties had not agreed upon such matters as a bond of the sub-contractor, reciprocal liability in liquidated damages for delay, or time provisions for remedy of defects. It is also true the parties had not agreed whether payment to the sub-contractor would be at or in excess of the provisions in the general conditions. But we do not believe the contract is defeated because there was no specific agreement on these matters. We are instead of the opinion that the essential terms had been agreed upon: The materials and labor to be furnished were specified in the plans and specifications; the cost of the labor and materials was agreed upon; the time of performance would have to accord with provisions of the contract between the contractor and the school board, which called for substantial completion not later than July 10, 1954. The affirmance of the judgment of the trial court does no damage to the well settled rule that a contract to enter into a future contract will not be enforced unless the essential and material terms have been agreed upon. 12 Am.Jur. (Contracts) § 24. See also authorities cited supra.

It follows from what has been said that the judgment of the trial court should be affirmed, and it is so ordered.

COMPTON, C. J., and LUJAN, SADLER and KIKER, JJ., concur.