BUILDING MART, INC., Appellant,

v.

ALLISON STEEL MANUFACTURING
CO., Appellee.

No. 8891.

United States Court of Appeals
Tenth Circuit.

July 12, 1967.

John P. Eastham, Albuquerque, N. M.
(Rodey, Dickason, Sloan, Akin & Robb,
Albuquerque, N. M., on the brief) for
appellant.

Lewis R. Sutin, Albuquerque, N. M.
(Sutin & Jones, Albuquerque, N. M., and
Snell & Wilmer, Phoenix, Ariz., with
him on the brief) for appellee.

Before PICKETT, Senior Circuit
Judge, SETH, Circuit Judge and CHRIS-
TENSEN, District Judge.

PER CURIAM.

This action was removed to the United
States District Court for the District
of New Mexico by reason of requisite
diversity of citizenship and amount in
controversy. After written interroga-
tories were served and answered and
depositions had been taken the district
court granted the motion for summary
judgment of defendant (appellee) Allison
Steel Manufacturing Co., denied the mo-
tion for partial summary judgment on
the issue of liability of the plaintiff
(appellant) Building Mart, Inc., and dis-
missed the complaint with prejudice. Ap-
pellant has appealed from the summary
judgment against it.

The record, viewed in the light
most favorable to appellant, as we are
required to do in passing upon the pro-
priety of summary judgment,[1] tends to
establish the following facts, most of
which appear without substantial con-
flict.

---

1. United States v. Diebold, Inc., 369 U.S.
654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962);
Frey v. Frankel, 361 F.2d 437 (10th Cir.
1966). Cf. Bolack v. Underwood, 340 F.
2d 816 (10th Cir. 1965).

Appellant (Building Mart, Inc.) became the general contractor for the construction of the Amrad Radar Shield at White Sands, New Mexico, by virtue of a United States contract formally awarded on November 6, 1964. Prior to that date appellee (Allison Steel), through its New Mexico branch manager, Vance Fagan,[2] contacted appellant by telephone and requested an appointment to discuss the possibility of his company's being named subcontractor for the supply and erection of the structural steel for the project. Discussions between Fagan and Glazer, vice president of appellant, were held between November 2 and 4, 1964, during which time appellee orally proposed to do the structural steel portion of the radar shield at a price of $250,000. The terms and conditions of the oral proposal were accepted by Glazer. When the negotiations were concluded Fagan was told, "You have the job", and Kelley Hunt, general manager of appellant, upon entering the office and being informed that they—Fagan and Glazer—had "worked out an understanding or an agreement", shook hands with Fagan "and told him we were glad to see him, glad that we were going to be working together and hoped that all turned out fine * * *."[3]

The negotiations of November 2–4 and subsequent phone conversations resulted in a letter from Glazer to Fagan dated November 8, 1964. It read in part:

"From phone conversation and your visit to El Paso I interpret your offer as follows: * * *" (Nine items then follow relating to general and special conditions, preparation of work site, and furnishing and erection of structural steel.)

In his deposition Glazer testified that the letter "attempted to set out all the terms of the contract" they had negotiated, that they represented what he felt they previously "had agreed upon; and (he) * * * was just getting it down so that when (he) * * * wrote the contract it would be acceptable to both parties." Following this letter were three conversations between Glazer and Fagan which mainly concerned setting up the contract.

Next in chronology, and in answer to Glazer's letter of November 8, is a letter from Fagan dated November 11, 1964, portions of which read as follows:

"In order to clarify the significant terms of our proposal to furnish and erect steel on the Amrad project I am listing the following general terms we would require in our contract. * * *" (Twelve items, similar but more detailed than those contained in Glazer's letter of November 8, then follow.)

"I hope that this proposal is in substantial agreement with our verbal understandings and that a contract can be drawn up incorporating these provisions where applicable in the very near future. Several of the steel items required for this contract are only available from the mills during limited rolling order dates and an immediant (sic) order must be placed for some items if delivery is to be made within the desired time period. For this reason this offer is of very limited duration and should be acted upon immediantly (sic).

"We look forward to a pleasant and profitable relationship with your firm."

Between November 11, 1964, and November 17, 1964, additional conversations were had between Glazer and Fagan. On November 16 Fagan was called in Phoenix and because of a sales tax problem it was agreed that the contract price should be increased to $253,000. Glazer testified that it was during this con-

2. No issue is raised in this appeal as to Fagan's authority or power to bind appellee and we find no reason for question on the point.

3. Glazer also deposed that the substance of these conversations was that Fagan "quoted us a price for performing the structural steel and we awarded him a contract", and that "we accepted the verbal proposal of November the 2nd."

versation, when the contract price adjustment was negotiated, that "the terms of the contract were finalized * * * ", that the terms of Fagan's letter of November 11 were "acceptable and were accepted", and that he "went over the subcontract as (he) * * * intended to write it, and (showed) * * * that it met all the conditions of the letter of November the 11th." Glazer then handwrote the formal subcontract as it had been agreed upon. On November 17 he called Fagan and went over the entire handwritten form, explaining point by point that it covered all the terms required by his November 11 letter. It was agreed that it did meet those terms, and then Glazer had the contract typed and a copy sent to appellee's home office in Phoenix for signing.[4]

On December 4, 1964, appellant wrote appellee a letter which was received on December 8. It read:

"On November 18th we mailed two copies of contract to furnish and erect steel for Amrad Clutter Shield. One copy was to be executed and returned for our files. To date we have not received this copy.

"I have a monster IBM system blinking and chattering and raring to process data on this project, but unsigned contracts don't count. Please help me and LBJ keep the lights turned out by expediting return of signed contract."[5]

On December 5, 1964, appellee wrote appellant:

"After serious consideration, we regret to advise that we cannot accept your subcontract No. 360–170–1118 covering the reinforcing and structural steel for the Amrad Radar Shield at White Sands, New Mexico. The Subcontract submitted did not meet even our requirements expressed to you in prior negotiations, and we do not believe that further negotiations could result in our reaching any agreement."

There is evidence tending to show that this letter was written because of appellee's ultimate conclusion that the subcontract was underbid, and that no claimed uncertainty in the prior understanding between the parties was responsible for appellee's new posture.

The record contains evidence of additional conduct indicating that the parties understood that a subcontract had been entered into theretofore. On the 13th of November, 1964, Fagan and Glazer met at the job site at White Sands and discussed job progress, laid out where appellee's fabrication yard was to be cleared, and agreed on a clearing for appellee's crane. Glazer also testified that Fagan visited the site a second time but he was uncertain of the date. On November 19, appellee's routing slip for approval of the formal contract submitted by appellant had been started through the proper channels and had received the approval of numerous officers and appellee's chief estimator, John Ziemba, by the time appellee withdrew. Because it would save appellee money, Fagan requested a modification in the contract's design. Glazer negotiated the change order with the Corps of Engineers. Between November 24 to December 2, appellee's steel fabrication

4. Glazer testified: "Then I called on the 17th. I'm positive at this time I reviewed the exact wording of the contract as I had written it, and I believe I went over it point by point to show that I agreed with the letter here in this office (that dated November 11, 1964), and at the same time I did the same thing with him, explaining point by point how I had taken care of all his terms * * * I had that typed on the 18th and mailed the contract on the 18th. It was actually handwritten on the 17th and he had agreed to all the terms."

5. We cannot attach to this letter in light of the other evidence the conclusive effect against the existence of an enforceable contract which has been assigned to it by the appellee, and perhaps by the trial court, in view of its obvious humorous slant and the explanation of its words consistent with the view that a binding oral agreement had been concluded but that its proof by the contemplated written restatement was deemed important.

division, Western Rolling Mills, was directed to and did prepare shop drawings on the steel to be used in the job. Shop drawings were prepared by appellee and transmitted to appellant for its approval on December 2. On December 2, appellee put through a sales order to its steel fabricating division, Western Rolling Mills, to start the fabrication of the steel to be used in the job. On December 7, appellee's accounting department mailed a Sales Tax Resale Certificate to appellant requesting return of sales tax information for the job. Throughout this period, telephone conversations took place in which advice and information regarding job progress were exchanged.

■ We are of the opinion that summary judgment on the record was not warranted. There was evidence from which it reasonably could be found that the parties had entered into a valid subcontract, and no rule of law on the record before the trial court precluded such possible result. Phillips Petroleum Company v. Buster, 241 F.2d 178 (10th Cir. 1957); Lehigh Structural Steel Co. v. Great Lakes Const. Co., 72 F.2d 229 (2d Cir. 1934); Bogle v. Potter, 72 N.M. 99, 380 P.2d 839 (1963); Stites v. Yelverton, 60 N.M. 190, 289 P.2d 628 (1955); Duggan v. Matthew Cummings Co., 277 Mass. 445, 178 N.E. 825 (1931). Cf. Uniform Commercial Code § 2–204(3).

The question whether the parties intended any prior agreement to be binding notwithstanding a contemplated later written memorialization also was a question of fact inappropriate for summary resolution. Federal Security Insurance Company v. Smith, 259 F.2d 294 (10th Cir. 1958); Melo-Sonics Corporation v. Cropp, 342 F.2d 856 (3d Cir. 1965); National Gas Appliance Corp. v. Manitowoc Company, 311 F.2d 896 (7th Cir. 1962); Lehigh Structural Steel Co. v. Great Lakes Const. Co., 72 F.2d 229 (2d Cir. 1934), supra; see generally 1 Williston, Contracts § 28 (3d ed., Jaeger, 1957). This court very recently had occasion again to note the impropriety of summary judgment on the issue of intent when the evidence was susceptible of conflicting inferences. Nafco Oil and Gas, Inc. v. Appleman, 380 F.2d 323 (10th Cir. 1967).

Reversed and remanded for further proceedings.