Sigmund SOMMER, Plaintiff,

v.

HILTON HOTELS CORPORATION, Defendant.

Nos. 74 Civ. 741 (MIG).

United States District Court, S. D. New York.

May 22, 1974.

Dreyer & Traub, New York City, for plaintiff; Leonard Holland, Thomas C. Lambert, New York City, of counsel.

Hale Russell & Stentzel, New York City, for defendant; Louis Hayner Kurrelmeyer, Stephen C. Pascal, New York City, of counsel.

GURFEIN, District Judge:

This is a motion for summary judgment, pursuant to Rule 56, by the plaintiff Sigmund Sommer in his action to obtain the return of a deposit of $100,000 made in connection with an offer to purchase the Statler Hilton Hotel ("the Hotel") in New York City from the defendant, Hilton Hotels Corporation ("Hilton") for $20,000,000. The action was removed to the federal court on diversity of citizenship, 28 U.S.C. § 1441. New York law governs. Guaranty Trust Co. v. York, 326 U.S. 99, 65 S. Ct. 1464, 89 L.Ed. 2079 (1945). The history of the transaction is as follows, as evidenced by the affidavits of the parties.

By letter dated August 24, 1973, the plaintiff, through his agent, offered to purchase the Hotel. The letter contained the following terms and conditions, among others:

"1. Purchase Price—$20,000,000. This sum is broken down as follows: existing first mortgage currently reduced to approximately $9,450,000; balance all cash.

\* \* \* \* \* \*

4. It is our understanding that all store or commercial leases in the property either expire on or before December 31, 1976 or contain provisions permitting termination without penalty in the event of demolition.

\* \* \* \* \* \*

7. Naturally this transaction, if and when approved by your Board of Directors, is subject to appro-

priate documents being drawn mutually satisfactory to both parties. . . ." [1]

Thereafter, the defendant transmitted to the plaintiff what the defendant represented to be a complete listing of the expiration dates of all commercial leases in the hotel. It appeared from this list that there were only five leases which did not conform to condition No. 4 in plaintiff's offer. By letter of September 24, 1973, the plaintiff advised the defendant that he was agreeing to amend his offer to accept the property subject to the five non-conforming leases. Under cover of this September 24, 1973 letter, the plaintiff enclosed a check payable to the defendant and stated as follows:

"As evidence of good faith, I am enclosing a check in the amount of $100,000 drawn on the Kings County Trust Company to the order of Hilton Hotels Corporation to be credited on account of the purchase price if satisfactory contracts are executed or to be returned to me promptly on October 2, 1973 if my offer has not been accepted or if the sale does not materialize for whatever reason."

By letter dated October 8, 1973, the defendant wrote to the plaintiff as follows:

"I am pleased to advise you that I have been authorized on behalf of Hilton Hotels Corporation, to accept your offer to purchase from Hilton its interest in the New York Statler Hilton, including furniture and operating equipment in use at the time of delivery, on the terms outlined in Mr. Max Philippson's letter to me of August 24, 1973, as modified by your letter to me of September 24, 1973, and Mr. Philippson's further letter to me of September 26, 1973, for a purchase price of $20 million, payable by the

---

1. Other provisions included the following:
"2. Hilton will continue to operate the hotel until December 31, 1976 under a management contract and receive as its compensation 3 percent of the *room revenue*.

3. The purchaser will put at the disposal of Hilton an amount not to exceed $500,000 used as working capital."

purchaser taking subject to the existing first mortgage and paying the balance in cash at the time of closing.

As indicated in the above letters, this agreement is subject to mutually satisfactory documentation, including appropriate provisions to reflect our understanding that the current assets of the hotel operation will be transferred, and the current liabilities assumed, on a dollar-for-dollar basis, and other provisions for adjustments and prorations normal to a sale of an operating hotel."

The plaintiff did not object to the acceptance as in any way inconsistent with his offer.

Under date of October 17, 1973, Hilton's lawyer, Cowen, sent plaintiff's lawyer, Traub, a title report as of 1964 and "a copy of the 1964 Note and Mortgage to Chase Manhattan Bank in the original principal amount of $12,000,000 which still constitutes a lien on the property", with the further comment that a draft of the proposed Agreement would be sent the first part of the coming week.

Traub would have received this letter either on October 18th or 19th. Traub did not wait for the draft of the proposed Agreement. Instead, on Monday, October 22, Traub replied, acknowledging receipt of the enclosures.[2] He wrote:

"After an examination of part of the leases affecting the captioned premises, we have come to conclude that the terms thereof do not come within my client's understanding of the deal, namely:

1. The lease with Statler Business Machines may be terminated, but at a cost of $35,000.00,

2. A new lease with the Mosler Foundation, not appearing in the tenant roll previously submitted, provides for termination upon the payment of $200,000.00 during 1973, declining by $10,000.00 per year until 1977, and thereafter for five (5) more years at a cost of $150,000.00

3. A problem with the Statler Business Machine lease was that pursuant to our reading of the lease, no rental is provided for the year 1978.

4. With reference to the Note and Mortgage held by the Chase Manhatten Bank, there are certain restrictions as to alienation, and in the event of transfer there is a pay-down requirement. Furthermore, a prepayment penalty of 1½% until November, 1974 and 1% thereafter is imposed.

After having discussed with my client the ramifications of the items set forth herein, he has authorized me to discontinue all legal discussions and negotiations in connection with the captioned matter, and, on behalf of my client, I hereby request the return of the check drawn to the order of Hilton Hotels Corporation in the sum of $100,000.00. I would appreciate the prompt return of the aforementioned check."

Hilton refused to return the check and this action followed.

Hilton says that Mr. Traub was in error with respect to the Statler Business Machines lease: that a rental was specified for each year, and that the penalty for termination in 1976 would have been only $7,000 rather than the $35,000 mentioned by Mr. Traub.

Mr. Traub apparently was right, however, in his comments regarding the Mosler Foundation lease and the pay-down aspect of the Chase Manhattan Note and Mortgage. The general prepayment penalty, however, had been known to Mr. Sommer since the negotiation was in an early stage. The serious new matters were the Mosler Foundation lease and the mortgage provision for a pay-down in the event of transfer of the fee.

2. Defendant's affidavit notes that the Arab oil boycott was announced on October 21.

The plaintiff contends that these new developments are not what he bargained for, and that he had the right to refuse to go forward. The defendant contends that the plaintiff's refusal to try to effectuate a formal contract was not in good faith, since these new developments were curable without detriment to Sommer.

Hilton concedes that the Mosler Foundation lease was not revealed to Sommer, presumably because it was out for execution on October 8 when the list of outstanding leases was given to him. It says, however, that arrangements to relocate the Mosler Foundation, as had been done once before, could have been made.

Regarding the Chase Manhattan mortgage, Hilton does not deny that there is a requirement of pay-down in the event of transfer but argues that the purpose of that provision was to insure the retention of the skill and resources of Hilton as operator of the Hotel. The defendant suggests that this could have been handled either by getting Chase Manhattan to waive the pay-down since Hilton would continue to operate the hotel or by Hilton making the pay-down out of the approximately $10,500,000 cash to be received from Sommer, Hilton taking a second mortgage for the amount paid to the mortgagee. Finally, it suggests that the entire mortgage could have been refinanced. The last suggestion is doubtful, since the Chase mortgage carried an interest rate of only 6% per annum.

It is reasonably clear, however, that if Hilton were willing to apply cash to the pay-down required on the first mortgage and to take a second mortgage for that amount, the cash terms of the transaction would have enabled it to do so.

The plaintiff seeks recovery of his $100,000 deposit on the theories of conversion (first claim) and of money had and received (second claim).[3] The defendant contends that there are triable issues of fact (a) on what were the plaintiff's reasons for having Mr. Traub send his letter of October 22, 1973; (b) were the documents received from the defendant after October 8, 1973 incurably inconsistent with the terms of the prior documents, including plaintiff's offer; (c) was plaintiff's $100,000 sent to defendant in good faith and was its return demanded in good faith?

It is the position of the plaintiff that these issues are irrelevant to a proper judgment. First, he relies on the explicit language of the letter transmitting the $100,000 deposit, wherein the plaintiff stated expressly that the $100,000 was "to be returned to me promptly on October 2, 1973[4] if my offer is not accepted or if the sale does not materialize for whatever reason." He emphasizes "for whatever reason." He argues that since the sale did not materialize he need prove nothing more than that the stipulated contingency occurred, implying, however, that there had, in fact, been no meeting of the minds. In any event, the plaintiff contends, if there was a contract it was specifically made subject to the execution of a formal contract, and hence the purchaser is entitled to the return of his deposit.

The plaintiff argues further that assuming a binding agreement and a unilateral breach by the plaintiff, he is, nevertheless, entitled to the return of his deposit, because it was not to be applied to the purchase price, but was rather a binder on a contract that never came into being. He emphasizes that there was nothing to indicate that the deposit was given as a penalty or as liquidated damages. Finally, the plaintiff submits that since new facts were presented which were not in accord with plaintiff's offer, he was under no obligation to wait and see whether the seller could cure the discrepancies.

The defendant counters that (1) a binding contract may exist even though a formal agreement is specified and has

---

3. The claim for punitive damages is not part of the motion for summary judgment.

4. Extended to October 8, 1973 by letter of September 26, 1973.

not been signed; and (2) a part payment may not be recovered if the purchaser refuses to proceed in good faith to seek agreement on open matters.

The contentions of the parties require a close look at the law of New York to determine whether on every view of the facts, summary judgment will lie.

In New York there is a sharp distinction between the right to specific performance and the right to recover back a deposit on a contract for the sale of real property. The difference between the remedies may be seen in two cases that came to the Court of Appeals in 1927. Each involved a contract for the purchase of real property in which the terms of the mortgage were left open for future agreement. Pollak v. Dopper, 245 N.Y. 628, 157 N.E. 886, affirming, 219 App.Div. 455, 220 N.Y.S. 104 (1st Dept. 1927), and Keystone Hardware Corp. v. Tague, 246 N.Y. 79, 158 N.E. 27. In *Pollak,* the purchaser sued for specific performance and lost because the writing was not a complete contract for lack of agreement on the terms of the mortgage. In *Keystone,* the purchaser sued to get his deposit back and lost his motion for summary judgment even though the writing was not a complete contract for a similar lack of agreement on the terms of the mortgage.

The New York Court of Appeals in *Keystone* reasoned that "when a part payment is made under a binder such as the one in suit, the party making the payment, the vendee, may not recover it thereafter if he has wilfully refused to make any genuine effort to reach an agreement as to the details left open for subsequent adjustment. Such refusal will indeed be effective to thwart specific performance at the suit of the vendor. It will not confer a cause of action for money had and received, a cause of action rooted in principles of equity." 246 N.Y. at 85, 158 N.E. at 28.

■ When the deposit is a part payment to be credited to the purchase price, rather than a deposit to "bind"

the parties until a contract can be drawn, "it is immaterial that the defendant [the seller] may be inequitably enriched by a denial to plaintiffs of a recovery back of their down payment." Silverstein v. Cerebral Palsy Ass'n, 17 A.D.2d 160, 164, 232 N.Y.S.2d 968, 972 (1st Dept. 1962).

■ On a motion for summary judgment, the Court must take "that view of the evidence most favorable to the opponent of the moving party." Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2 Cir. 1962). On that view of the matter, I cannot say that there are no issues of fact to be tried under New York law.

(1) There is dispute whether the deposit was to be credited to the purchase price, as the plaintiff wrote, or whether it was not to be, as the defendant's acceptance may be read to mean.

■ (2) The threshold question is whether the correspondence of the parties contained the essential elements of the transaction. If it did, the reference to a formal contract to be drawn later would not negate the existence of a contract arising from the correspondence itself. Sanders v. Pottlitzer Bros. Fruit Co., 144 N.Y. 209, 39 N.E. 75 (1894).

■ Even the condition that the formal contract be "mutually satisfactory" —a condition not present in the *Pottlitzer* case—can in some circumstances be interpreted to mean "reasonably satisfactory." See Bondy v. Harvey, 62 F.2d 521, 524 (CCA 2, 1933); and see Lehigh Structural Steel Co. v. Great Lakes Const. Co., 72 F.2d 229, 231 (CCA 2, 1934).

■ (3) Whether there was a meeting of the minds on essential terms arising out of the correspondence may be a mixed question of law and fact, susceptible of jury determination in the light of the circumstances. See 3 Corbin on Contracts § 554 at 226–27; Building Mart, Inc. v. Allison Steel Manufacturing Co., 380 F.2d 196 (10 Cir. 1967); Melo-Sonics Corp. v. Cropp, 342 F.2d 856 (3 Cir. 1965). See also Meyers v.

**302**

Selznick Co., 373 F.2d 218, 223 (2 Cir. 1966), citing with approval Osborn v. Boeing Airplane Co., 309 F.2d 99, 103 (9 Cir. 1962). The question to be put is whether the parties intended to be bound in the absence of a formal contract.

(4) Even if there was no meeting of the minds on *all* the essential terms, there is still the issue of good faith posed by *Keystone, supra,* in which summary judgment was denied because of existence of that issue.

■ (5) We must consider the argument of the plaintiff, however, that he was circumspect enough, not only to require mutually satisfactory documentation, but also to provide that if the sale does not materialize "for any reason" he is to get his money back.

■ I think the thrust of the phrase "for any reason" may be found to be overbalanced by the tendering of the check, in the plaintiff's words, "as evidence of good faith." In New York, it is an honored rule that every contract carries with it 'an implied obligation of good faith. See Matter of DeLaurentiis (Cinematografica), 9 N.Y.2d 503, 509–510, 215 N.Y.S.2d 60, 174 N.E.2d 736 (1961); Kirke LaShelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163 (1933). Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917).

The *Keystone* decision, *supra,* turned on an implication of good faith in circumstances much like these. Here it was made explicit that the deposit was "evidence of good faith." As in *Keystone,* it would be for the trier of fact to say, therefore, whether the recognition by the plaintiff that his deposit was an evidence of good faith meant that his good faith was to survive at least until it was found that the transaction could not be consummated. It would be for the trier of fact to say whether the plaintiff had acted in accordance with the obligation of good faith so found.

The motion for summary judgment is denied.

It is so ordered.