639 P.2d 586

**BALBOA CONSTRUCTION CO., INC., a California corporation, Plaintiff-Appellant,**

v.

**Peter GOLDEN, a/k/a Pete Golden and P. Golden, and Golden Land and Cattle, a New Mexico corporation, Defendants-Appellees.**

No. 5153.

Court of Appeals of New Mexico.

Dec. 31, 1981.

Richard L. Lastrapes, Jr., Lastrapes, White & Merl, Albuquerque, for plaintiff-appellant.

David E. Martin, Martin & Hilton, Albuquerque, for defendants-appellees.

## OPINION

DONNELLY, Judge.

Plaintiff, Balboa Construction Co., Inc., (Balboa), brought this action against defendants Peter Golden and Golden Land and Cattle, Inc., seeking specific performance of an alleged agreement to sell certain real estate, or in the alternative, seeking damages for breach of contract. Defendants specifically denied the formation of any valid contract between the parties and also pled the statute of frauds as an affirmative defense. Balboa appeals from a judgment of the district court and a denial of its motion for a new trial. We affirm the trial court.

Balboa has challenged as error (1) the trial court's finding that no contract existed between the parties for the sale of real estate, (2) the trial court's failure to hold that defendants were equitably estopped to deny existence of an agreement to sell such real estate, and (3) the trial court's finding that Balboa had failed to prove liability or resulting damage by any acts of defendants.

### I. Was There a Contract?

As developed at trial, Balboa became interested in certain real estate owned by defendants, located in the City of Albuquerque, referred to as "Four Hills Self Storage." It consisted of two separate parcels of property upon which a total of 443 storage units were located.

Balboa officials were shown the properties by Brown Realty Company realtors on behalf of defendants and negotiations commenced between the parties. A series of offers and counter-proposals were made. On May 9, 1979, Balboa submitted an initial written offer to defendants to purchase the real estate in question. Defendants declined to accept, but responded on May 24, 1979 by making a written counter-offer for the sale of the properties. The counter-offer was not accepted.

On June 21, 1979, defendants tendered to Balboa another written counter-offer for the sale of such real estate for the sum of $1,100,000.00. It required Balboa to pay as a down payment the amount of "$100,000.00 net to seller," to pay the two existing mortgages on the property in the amount of $723,000.00, and to release defendants from liability thereon. This counter-offer further required that Balboa pay the remaining $277,000.00 of the purchase price to defendants by making certain specified monthly payments and a final balloon payment in full, five years from date of closing.

On June 21, 1979, the counter-offer of defendants was signed by Pete Golden, President of Golden Land and Cattle Corporation and Pete Golden, individually. On June 29, 1979, Olga May, an agent for Balboa, wrote to defendant Pete Golden purporting to accept an alleged oral agreement (based on defendants' said counter-offer and certain modifications thereto), entered into by telephone on June 27, 1979. Balboa submitted a written "addendum" bearing a typewritten date of June 27, 1979 and a written date of July 1, 1979, to evidence this oral agreement. The addendum recited that it was to be made a part of the purchase agreement dated June 21, 1979, and that the total purchase price of the property was to be the sum of $1,050,000.00.

Defendants refused to sign the written addendum agreement, and on July 2, 1979, responded with another proposed sale agreement. This July 2, 1979, written proposal specified that certain provisions in Balboa's written proposal were agreeable, but it proposed changes in several features of Balboa's written addendum. This written proposal stated at the bottom: "Expira-

tion: This counter-offer shall expire unless a copy hereof with purchaser's written acceptance is delivered to seller or his agent within 5 days from date." This counter-offer recited and altered certain conditions for dealing with existing mortgages on the property and for securing the balance of the unpaid purchase price, as follows:

2. If mortgagees do not release seller, then seller will use a New Mexico Real Estate contract to sell, and not accept corporate notes. Purchaser must apply for mortgage transfer & sellers complete release, and accept mortgagee's transfer fees, prior to closing.

3. Equity-adjusted at closing—(sale price, less loans—)—

4. Down payment $100,000 net to seller, *less title insurance policy only*, balance as described in # 2 above.

6. [sic]—1st yr., interest of 10% only, payable monthly, 1st payment 30 days from closing date, then a 7 year amortization on the balance of approximately $277,000.00, 10% int., ($3,195.86 Approximately) commencing with 13th month, & continuing each and every month thereafter until the entire unpaid principle balance and interest shall have been paid in full, the note shall be guaranteed personally by Michael Goland [Emphasis supplied.]

On June 29, 1979, Balboa's agent Olga May sent the June 21, 1979 counter-offer of defendant and Balboa's addendum of June 27, 1979 to defendants' agent, Sam Brown. Brown answered this communication by typing on the same letter of transmittal, under the date of July 3, 1979, that he had taken the papers to Pete Golden and that, "He agreed to all with about four things that he thought were agreed in his office— 10 year term instead of 11 years—close here with the Title Co.—pro-rations adjusted in the corporate notes so Pete nets $100,000.00 less cost of title insurance only. If assumption of mortgages with release of liability to Pete is not possible before closing, he offers to make the same with a real estate contract instead of corporate notes."

Defendants' July 2, 1979 counter-offer was signed and purportedly accepted by Balboa's president and dated July 10, 1979. On July 12, 1979, Balboa's agent wrote to defendants' realtor, stating that the parties were in complete accord. They enclosed signed copies of defendants' counter-offer. Several weeks later, agents of Balboa flew to Albuquerque seeking to close the sale, but defendants refused to execute any formal sales agreement or to acknowledge that the parties had reached a final agreement.

On August 7, 1979, defendants entered into, and subsequently consummated, a written agreement to sell the real estate in question to another party for $1,125,000.00. Upon ascertaining that defendants had already sold the properties, Balboa filed this action.

■ At the close of plaintiff's case in chief, the trial court ruled in favor of defendants. On a motion to dismiss made at the close of a plaintiff's case in chief, the trial court has the right to weigh the evidence presented and determine whether a prima facie case had been made. *Armijo v. Via Development Corp.*, 81 N.M. 262, 466 P.2d 108 (1970). On appeal, review of such a dismissal is limited to whether the trial court's findings are supported by substantial evidence. *Worthey v. Sedillo Title Guaranty, Inc.*, 85 N.M. 339, 512 P.2d 667 (1973).

In its decision, the court made the following relevant findings of fact.

15. Defendants' counter-offer of July 2, 1979 provided for definite and stated terms and was limited for a period of five (5) days and unless the offer was returned and accepted without modification, the counter-offer would lapse.

16. Plaintiff failed to accept the terms of the counter-offer of July 2, 1979, and therefore the counter-offer lapsed and there was no agreement between the parties regarding the sale of the subject property.

17. Plaintiff provided a response to the limited counter-offer of July 2, 1979, from defendants, but this counter-offer was submitted after the deadline and it

contained materially different terms from the defendants' counter-offer and therefore there was no agreement between the parties.

18. The parties did not enter into an agreement regarding the essential and material aspects of the sale of the subject property and there not having been a meeting of the minds, there is no enforceable contract between plaintiff and defendants.

Balboa asserts that the parties had reached a meeting of the minds on all material terms of an agreement for the sale and purchase of the real estate, but the trial court in its ruling failed to distinguish between an oral contract for sale of realty evidenced by a written document and a written contract consisting of one or more documents. In his ruling on defendant's motion for a directed verdict, the trial judge stated:

The issues presented in this case are rather numerous, but not necessarily all that complicated, and in the State of New Mexico, as in most states, a purported, or alleged contract for the sale and purchase of real estate, must be in writing, and must be signed by all of the parties to the transaction. That does not mean, however, and counsel is correct, that this must all be contained in one writing.

Balboa contends that the court misinterpreted the law in New Mexico in arriving at its ruling by failing to perceive that an oral contract evidenced by an appropriate writing is sufficient to remove an agreement for the sale of realty from the bar of the statute of frauds.

Balboa submits that the memorandum dated July 3, 1979, signed by Sam Brown as defendants' agent, acknowledging receipt of the June 29, 1979 letter and addendum from Olga May as Balboa's agent, constituted a written document sufficient to satisfy the statute of frauds. This memorandum, Balboa contends, confirms that the parties had reached agreement on the essential terms of the proposed sale.

Nevertheless, Balboa subsequently forwarded to defendants the "acceptance of counter-offer" dated July 10, 1979, signed by Michael Goland as Balboa president, which stated:

Acceptance of counter-offer dated July 2nd, 1979, made by Pete Golden to Balboa Construction Co., Inc. on Four Hills Self Storage, together with other terms and conditions in original offer to purchase dated and signed by Pete Golden on June 21, 1979, and Addendum "A" dated June 27, 1979, and signed by Michael Goland for Balboa Construction Co., Inc., on July 1st, 1979.

All terms are agreed to by the undersigned with the following clarifications:

\* \* \* .\* \* \*

Balboa Construction Co., Inc. will execute a New Mexico form Real Estate Contract to sell for an amount totalling approximately $723,100.00 or an amount equalling the total of the existing mortgages plus $100.00 in favor of Pete Golden, payable at $6,856.75 per month including 10% interest with the principal balance due as per the same terms of the underlying mortgages.

As is frequently the case in controversies of this nature, marked conflicts in the evidence exist as to material and controlling facts. Examination of the record indicates conflicting testimony between the parties and their witnesses as to whether Balboa accepted the defendants' July 2, 1979 counter-offer within the time constraints specified.

In Balboa's brief in chief, the contention is made that "from the evidence, taken as a whole, it is clear that the parties had reached an *oral* agreement of the essential terms (although the precise moment of such agreement might be debated) and that the requirements of the statute of frauds have been met."

In New Mexico the statute of frauds has been adopted as part of the common law. *Rhodes v. Wilkins*, 83 N.M. 782, 498 P.2d 311 (1972); *Boswell v. Rio de Oro Uranium Mines, Inc.*, 68 N.M. 457, 362 P.2d 991 (1961); *Pitek v. McGuire*, 51 N.M. 364, 184 P.2d 647, 1 A.L.R.2d 830 (1947). Balboa is

correct that New Mexico recognizes as enforceable under the statute of frauds a valid contract for the sale of realty evidenced either by any type of writing constituting a memorandum of a parol contract, or by a formal written contract, if signed by the party to be charged. *Pitek v. McGuire, supra; Jennings v. Ruidoso Racing Association,* 79 N.M. 144, 441 P.2d 42 (1968); *Boswell v. Rio de Oro Uranium Mines, Inc., supra.*

■ The parties' intentions to become bound to a contract, and thus the timeliness of an acceptance, are questions of fact depending upon the circumstances of the case. *See Stites v. Yelverton,* 60 N.M. 190, 289 P.2d 628 (1955). In its findings Nos. 15 and 16, the trial court stated that Balboa failed to accept the terms of defendant's counter-offer of July 2, 1979 within the five day deadline and therefore the offer lapsed. These findings were supported by substantial evidence in the record. Without reciting all of the evidence supportive of such findings, the following testimony of Michael Goland, president of Balboa concerning defendants' counter-offer is significant:

Q. When did you, or your agent receive it?

A. Probably about the 4th.

Q. Did you sign it and return it within five days?

A. If I signed a counter part of it, it went first to the broker and then back, but the escrow instructions, what we call the closing instructions had gone out and had been acknowledged that they were acceptable.

Q. Did you sign this document and return it within five days?

A. I don't know.

* * * * * *

Q. Isn't it true, in fact, on July 10, eight days after that you forwarded this document marked Plaintiff's Exhibit No. 4, to Mr. Goland?

A. That is correct.

Q. That is dated July 10th.

A. That is dated July 10th.

Q. That is more than five days after his document dated July 2nd.

A. That's true.

Defendants' July 2, 1979, written counter-offer to Balboa specifically provided that acceptance of such counter-offer "shall not be effective until personally received by [defendants' agent] Sam Brown—Brown Realty Co." Since the defendants counter-offer carried the five day mandatory acceptance requirement, the trial court's finding of an untimely acceptance was proper.

■ It is our well-established rule that, due to the advantageous position of the trial court, we should indulge in considerable deference to its findings and decision as to the weight to be given to each witness' testimony. Where the factual evidence is in dispute the trial court's findings should not be disturbed on appeal unless they are unsupported by substantial evidence. *Getz v. Equitable Life Assurance Society,* 90 N.M. 195, 561 P.2d 468, *cert. denied,* 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977); see, *Lujan v. Merhege,* 86 N.M. 26, 519 P.2d 122 (1974); *Worthey v. Sedillo Title Guaranty, Inc., supra; Thompson v. Getman,* 74 N.M. 1, 389 P.2d 854 (1964).

Since the evidence was in dispute as to the timeliness of Balboa's acceptance and there was evidence to support the trial court's findings, such findings are binding on appeal and determinative that no valid contract was entered into between the parties.

Balboa, however, asserts that defendants did in fact agree to all material aspects of the sale between the parties and that defendants agent, Sam Brown, admitted this in his July 3, 1979, reply to Olga May. This contention is contradicted by Sam Brown, the agent for defendants. Brown testified that in respect to the last offer and counter-offer between the parties there were four things that remained to be worked out between the parties. From reviewing the testimony and exhibits before the trial court the evidence was sharply in dispute as to whether any meeting of the minds of the parties was ever reached as to all material

facts of such agreement and whether any agreement was appropriately evidenced by a written document or memoranda sufficient to satisfy the requirement of the statute of frauds.

Balboa also contends that the court, in both its oral ruling at the close of the evidence and its findings of fact, erroneously concluded that under the statute of frauds, no valid oral agreement had been reached between the parties for the sale of such real estate. Balboa submits that the agreement of the parties and the essential terms thereof were properly memorialized by a sufficient writing to avoid the statute of frauds.

█ Oral statements of a judge in articulating his ruling at the close of trial do not constitute a "decision" within the meaning of N.M.R.Civ.P. 52(B)(a)(1), N.M.S.A.1978, and error may not be predicated thereon. *Ellis v. Parmer*, 76 N.M. 626, 417 P.2d 436 (1966); *Mirabal v. Robert E. McKee, General Contractor, Inc.*, 74 N.M. 455, 394 P.2d 851 (1964).

Nevertheless, the statute of frauds was applicable here. In *Aragon v. Boyd*, 80 N.M. 14, 450 P.2d 614 (1969), the court held that a series of letters established the existence of an oral testamentary contract. In *Aragon*, the court quoted *Pitek v. McGuire, supra*:

> To satisfy the statute of frauds the contract itself must be in writing; or if verbal, then there must have been some writing subsequently made however informal, stating each of its essential elements, signed by the person to be charged, or by his authorized agent acting for him.
>
> * * * * * *
>
> There is a difference between a contract in writing and a memorandum of a parol contract as contemplated by the statute of frauds. The former may be made up of letters and telegrams or any other character of writing or writings, which together will constitute a contract, or it may be a formal contract. But if the contract made is oral, it is written

evidence to prove that the particular contract was made that must be produced. The writings need not in themselves amount to a contract or be addressed to the other party. It is sufficient as evidence if the person to be bound signs any statement or document in which he admits that parties made the oral contract, *sufficiently stating therein its essential terms* (2 Williston on Contracts [Rev.Ed.] Secs. 567, 579 [a]); no matter what may be his purpose in making the writing, or to whom it is addressed. 2 Williston on Contracts (Rev.Ed.) Secs. 579, 568; 1 Restatement of Law of Contracts, Sec. 209. [Emphasis supplied].

█ An oral agreement sought to be enforced against the defense of statute of frauds can be evidenced by a series of writings, but collateral papers must be referred to in the memorandum itself. *Pitek v. McGuire, supra; see Rhodes v. Wilkins, supra.*

In such instance all the writings relied upon to evidence the existence of the purported contract between the parties must be signed by the party to be charged, or if only one is signed, it must appear that it was signed with reference to the others. *Boswell v. Rio de Oro Uranium Mines, Inc., supra; see also* Restatement (Second) of Contracts § 132 (1973).

In *Pitek*, the rule was stated that where a party seeks to establish the existence of a parol contract for the sale of realty by memoranda rather than a formal written contract, the writing relied upon must include a statement or admission by the party sought to be charged that an agreement between the parties had been reached, and a writing made prior to an oral agreement cannot alone satisfy the statute of frauds.

Vitally significant is the requirement that the essential or material terms of the contract between the parties be set forth in the writings relied upon, and the terms of the purported contract must be ascertainable from the writing or by reference to another writing, and cannot be proved by parol proof. *Aragon v. Boyd, supra; Pitek v. McGuire, supra; see also Rhodes v. Wil-*

*kins, supra; Stites v. Yelverton, supra.* As stated in Restatement (Second) of Contracts, *supra,* § 131, Comment g:

> The 'essential' terms of unperformed promises must be stated; 'details or particulars' need not. What is essential depends on the agreement and its context and also on the subsequent conduct of the parties, including the dispute which arises and the remedy sought.

■ Balboa challenges the correctness of the trial court's finding and conclusion that the parties failed to reach agreement regarding the essential terms of the sale of realty, and contends that the remaining undetermined issues were mechanical or minor particulars.

Balboa acknowledges in its brief in chief that one issue upon which the trial court found no meeting of the minds was the method of financing the unpaid purchase price: whether this transaction was to be closed by a "wrap-around" real estate contract, or by assumption and release of defendants from the underlying mortgages. Balboa submits, however, that in considering this issue the trial court failed to realize that Sam Brown, as agent for defendants, had offered the real estate contract method as an alternative to the originally agreed upon assumption, and, hence, the deviation was authorized by defendants.

Reviewing the record, we find ample basis to support the trial court's determination that the parties failed to reach a meeting of the minds on several material matters, including the method of financing.

Judge Franchini, announcing his ruling at the conclusion of plaintiff's case in chief, stated that he found the parties had not reached a meeting of the minds on the "basic question of whether or not this matter [the purported agreement for the sale of realty] was going to be accomplished by virtue of a wrap-around contract, or that the buyers, the plaintiff in this case, was going to see to it that the defendant was released from his obligation on the mortgage of some $700,000.00 plus, that is not mechanical, and that is material. And, no conclusion was ever reached on that during the course of these negotiations."

Balboa and defendants do not dispute the lack of final agreement on whether financing was to be a wrap-around real estate contract or assumption of the existing mortgages, but instead differ as to whether this constitutes an "essential" or a "mechanical" aspect of the contract.

A wrap-around real estate contract or wrap-around mortgage is a relatively new development in the area of real estate financing. It is a financing device consisting of a subsequent, and therefore junior, contract or mortgage that is written to secure a debt or obligation, which includes the amount of any outstanding mortgages as well as any new funds advanced. Significantly, however, the seller remains liable on the existing mortgages and the buyer does not assume them. *See* R. Boyer, Survey of the Law of Property 511 (3d ed. 1981). Wrap-around mortgages are defined in *ICM Realty v. Cabot, Cabot & Forbes Land Trust,* 378 F.Supp. 918 (S.D.N.Y.1974), as follows:

> A wrap around mortgage is a form of secondary financing typically used on older properties having [existing] first mortgages with low interest rates in which a lender assumes the * * * first mortgage obligation and also loans additional money, taking back * * * a junior mortgage in the total amount at an intermediate interest rate.

The method of financing amounted to an essential term of the alleged agreement not included in the written memoranda signed by the party sought to be charged. *Compare Edward H. Snow Development Co. v. Oxsheer,* 62 N.M. 113, 305 P.2d 727 (1957). The omission of written provisions evidencing agreement upon the terms of financing is fatal to Balboa's claim of the existence of an enforceable agreement for the sale of realty sufficient to satisfy the requirements of the statutes of frauds.

The trial court properly entered judgment for the defendants.

## II. *Equitable Estoppel:*

Balboa further contends that defendants were equitably estopped to deny the exist-

ence of a binding agreement between the parties for the sale of the subject real estate.

Balboa relies upon *Westerman v. City of Carlsbad*, 55 N.M. 550, 237 P.2d 356 (1951), and *Capo v. Century Life Ins. Co.*, 94 N.M. 373, 610 P.2d 1202 (1980), for the proposition that a party may be equitably estopped by his or her conduct from asserting the affirmative defense of statute of frauds.

No decision in New Mexico has expressly recognized estoppel as an exception to the statute of frauds. *Capo v. Century Life Insurance Co., supra*, addressed the issue of whether a party was estopped from alleging the illegality of a contract. In *Westerman v. City of Carlsbad*, supra, the court refused to apply equitable estoppel as an exception to the statute of frauds, but only on grounds that the theory was not pled. The holding in *Westerman* did not squarely resolve the question of whether in an appropriate case the doctrine of equitable estoppel may lie to bar assertion of the statute of frauds. *But see*, Annot., Promissory Estoppel as Basis for Avoidance of Statute of Frauds, 56 A.L.R.3d 1037 (1974).

It is not necessary, however, to reach such issue in this case, since we have determined that the trial court properly found no meeting of the minds on all of the essential terms of the contract between the parties. Where there is proper evidence before the trial court upon which to base its decision and to support its findings, on appeal we will review the evidence in a light most favorable to the successful party. *Southern Union Exploration Co. v. Wynn Exploration Co.*, 95 N.M. 594, 624 P.2d 536 (Ct.App.), *cert. denied*, 95 N.M. 593, 624 P.2d 535 (1981).

III. *Liability Damages*:

Balboa's third point on appeal asserts as error the trial court's finding that Balboa suffered no damages. The strength of Balboa's claim for damages necessarily rests upon the prerequisite of a valid contract. It is axiomatic that unless a valid contract may first be found, no action for specific performance will lie, and, alterna-

tively, there is no contract to be breached and hence no basis for ensuing damages. Since we find that the trial court correctly concluded that the parties did not enter into a valid contract for the sale of realty, the claim of damages for breach of contract must necessarily be decided adverse to Balboa.

Finding no error, we affirm the judgment of the trial court. The costs of this appeal shall be paid by Balboa.

IT IS SO ORDERED.

LOPEZ, J., concurs.

SUTIN, J., concurs specially.